708 So.2d 55 (1998)
Linda Brown MIZELL
v.
Ronnie Cleveland MIZELL.
No. 92-CA-00500-SCT.
Supreme Court of Mississippi.
February 26, 1998.
*57 G. Charles Bordis, IV, Sadler & Ranson, Ocean Springs, for Appellant.
Jack Parsons, Wiggins, for Appellee.
En Banc.
JAMES L. ROBERTS, Jr., Justice, for the Court:

STATEMENT OF CASE
¶ 1. Linda Brown Mizell ("Linda") filed a complaint in the Jackson County Chancery Court, seeking to have her former husband Ronnie Cleveland Mizell ("Ronnie") found in contempt for failing to abide by the provisions of a 1984 divorce decree. The chancellor entered a final judgment in April of 1992, awarding Linda $6,177.50, and addressing issues of arrearage of child support, college expenses, life insurance, mortgage payments, jointly accumulated real estate, and attorney's fees. Linda has appealed this judgment, citing the following errors:
I. THE CHANCELLOR WAS MANIFESTLY WRONG IN ALLOWING HUSBAND CREDIT FOR MONIES THAT HIS SON RECEIVED FROM AN ACCOUNT IN WHICH THE SON AND HUSBAND'S FATHER WERE JOINT OWNERS.
II. THE CHANCELLOR WAS MANIFESTLY WRONG IN ALLOWING THE PRIOR DIVORCE DECREE TO BE MODIFIED WITH REGARD TO PAYMENT OF COLLEGE EXPENSES AND THE RIGHT TO PARTITION REAL PROPERTY.
III. THE CHANCELLOR WAS MANIFESTLY WRONG IN FAILING TO AWARD WIFE 1/2 INTEREST IN LOTS 250 AND 251 OF WESTGATE ESTATES.
IV. THE CHANCELLOR WAS MANIFESTLY WRONG IN FINDING THAT HUSBAND HAD SATISFIED ALL MORTGAGE OBLIGATIONS ON THE MARITAL HOME FOLLOWING THE DIVORCE.
V. THE CHANCELLOR WAS MANIFESTLY WRONG IN FAILING TO FIND HUSBAND IN CONTEMPT OF COURT.
¶ 2. Ronnie has cross-appealed, citing the following error:
VI. THE CHANCELLOR WAS MANIFESTLY WRONG IN AWARDING LINDA $1000 IN ATTORNEYS FEES.

STATEMENT OF THE FACTS
¶ 3. Linda was granted a divorce from Ronnie on the grounds of habitual cruel and inhuman treatment by order of the Jackson County Chancery Court on July 18, 1984. Linda was awarded custody of Troy, the couple's only child, who was fifteen years old at the time of the divorce. Troy began college in the fall of 1987 at the age of eighteen. At the time of the trial for contempt in August of 1991, Troy was twenty-two years of age.
¶ 4. Ronnie, who did not appeal the chancellor's decision granting the divorce, was ordered to pay to Linda the sum of $200 per month as child support, to maintain a life insurance policy on himself for the benefit of Troy, and to pay all college expenses. Linda was awarded the use, possession, and occupancy of the marital home located on Lot 253, Westgates Estates in Gautier. Ronnie was ordered to make mortgage payments on the marital home.
*58 ¶ 5. In 1991, Linda filed a complaint for contempt against Ronnie, alleging that he had not complied with the terms of the 1984 divorce decree, by (1) failing to pay $7,200 in child support since Troy had turned eighteen years of age ($200 x 36 months = $7,200); (2) failing to pay $2,600 in college costs and expenses; (3) failing to maintain a life insurance policy on himself for the benefit of Troy; and (4) failing to pay a delinquent mortgage note in the amount of $362.
¶ 6. Ronnie answered with general denials and filed a counterclaim against Linda, alleging that child support should be terminated; that Linda be required to pay at least one-half of Troy's college expenses; that certain real property owned jointly by the parties should be partitioned; and that attorney's fees should be awarded to Ronnie to compensate for Linda's wrongful action.
¶ 7. Linda later amended her complaint, alleging that Ronnie had fraudulently induced her into making payments toward the satisfaction of an indebtedness of certain real estate contiguous to the marital home (Lots 250 and 251). Linda requested reformation of a deed conveying a third piece of property (Lot 249) from Ronnie to his father.
¶ 8. A trial was held in August of 1991. Testimony established that Troy had lived with Linda since the divorce. Ronnie had paid $200 per month child support to Linda until April of 1987, when Troy turned eighteen. At this point, Ronnie had discontinued paying child support, and removed his son as beneficiary of his life insurance policy. Ronnie testified that he and Linda were under the impression Ronnie was not required to pay child support beyond Troy's eighteenth birthday.
¶ 9. Ronnie and Linda were both employed as vocational counselors by Mississippi Gulf Coast Community College. As a benefit of his parents' employment, Troy attended college at Gulf Coast for a fee of $35.00 a semester, plus the costs of books and supplies. Troy began attending school at the Gautier campus in the fall of 1987. He worked part-time throughout the year and, at the time of trial in 1991, Ronnie had not contributed at all to Troy's college education. Ronnie's defenses were that no demand for college expenses had ever been made by Troy or Linda, that Troy's academic performance was poor, and that relations between father and son were strained.
¶ 10. The chancellor issued a written ruling in September 1991, and entered final judgment on April 21, 1992. In his ruling and final judgment, the chancellor made the following findings:
(1) Ronnie had failed to pay child support since Troy was eighteen years of age, and was in arrears in the amount of $1,440. The chancellor allowed credit for the monies withdrawn from Troy and his grandfather's joint account.
(2) Ronnie and Linda would each be required to pay one-half of Troy's college expenses;
(3) Ronnie, prior to Linda's purchase of his one-half interest, had satisfied all monthly obligations with regard to the marital home.
(4) Ronnie had failed to maintain Troy as a beneficiary of his life insurance policy.
(5) Linda had incurred joint liability on the purchase of Lots 250 and 251. The chancellor failed to order Ronnie to convey an interest to Linda; rather, the chancellor found that a constructive trust had been created in favor of Linda. Linda was granted a lien in the amount of $4,650 with interest, and Ronnie was given credit for $398.82 in property taxes, which sum was used as a setoff.
(6) Ronnie's counterclaim was dismissed, and the 1984 divorce decree was modified so as to allow each party the right to file suit for partition of Lot 252, and a 2.4 acre contiguous plot.
(7) Linda was awarded $1,000 in attorney's fees and Ronnie taxed with costs of court.
¶ 11. In the final judgment, the chancellor awarded Linda a total sum of $6,177.50, plus interest, as follows: $1,440 as child support arrearage; $87.50 as Ronnie's one-half share of the college expenses incurred by Troy during the first five (5) semesters of college; and $4,650 for mortgage payments and taxes made by Linda in satisfaction of the indebtedness *59 on Lots 250 and 251 of Westgates Estates.

DISCUSSION OF THE ISSUES
¶ 12. Our scope of review in domestic relations matters is limited by the familiar substantial evidence/manifest error rule. Stevison v. Woods, 560 So.2d 176, 180 (Miss. 1990).
¶ 13. "This Court will not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." Bell v. Parker, 563 So.2d 594, 596-97 (Miss. 1990). See also Faries v. Faries, 607 So.2d 1204, 1208 (Miss. 1992). In other words, "[o]n appeal [we are] required to respect the findings of fact made by a chancellor supported by credible evidence and not manifestly wrong." Newsom v. Newsom, 557 So.2d 511, 514 (Miss. 1990). See also Dillon v. Dillon, 498 So.2d 328, 329 (Miss. 1986). This is particularly true "in the areas of divorce and child support." Nichols v. Tedder, 547 So.2d 766, 781 (Miss. 1989).

I. THE CHANCELLOR WAS MANIFESTLY WRONG IN ALLOWING HUSBAND CREDIT FOR MONIES THAT HIS SON RECEIVED FROM AN ACCOUNT IN WHICH THE SON AND HUSBAND'S FATHER WERE JOINT OWNERS.
¶ 14. We disagree with the chancellor's decision to allow the father credit for child support from funds of the paternal grandfather and the child. It is unthinkable to attribute money which legally belongs to the child of this marriage to the father as child support payment. The record demonstrates that the chancellor was in error in crediting Ronnie Mizell with payment of child support out of money that in part already belonged to the child, Troy.
¶ 15. The divorce decree, entered on July 18, 1984, ordered Ronnie Mizell to pay the sum of $200 per month in child support for their son Troy. Ronnie was legally obligated to comply with this court order. Ronnie Mizell did not dispute the fact that he had made no child support payments on behalf of his son between the period of April 1987 and April 1990. Further, the testimony revealed that the sum of $160 per month was paid to Troy by Cleveland Mizell, the father of Ronnie and the grandfather of Troy, between April 10, 1987, to April 9, 1990. This money was paid to Troy from a joint account belonging to Cleveland and his grandson, Troy. The total sum paid out of this account amounted to $5,760. Ronnie was ordered to pay the balance of the deficit over 36 months (36 mos. x $40) in the total amount of $1,440. The testimony was conflicting as to the purpose behind Cleveland forwarding the $5,760 to Troy, i.e., whether it was intended to account for Ronnie's arrearage or whether it was intended for some independent purpose. Clearly, the payment of $160 for 36 months depleted funds to which Troy was legally entitled to: in simple terms, at least $80 of the $160 paid per month was Troy's money and could not be used as child support from his father, Ronnie Mizell. Had Ronnie rightfully paid his child support obligations, Troy's interest in the joint account would not have been diminished.
¶ 16. Furthermore, the testimony developed at trial alludes to the fact that the money contained in the joint account derived from Troy's paternal grandmother and that Cleveland Mizell, the grandfather, was well aware of the fact that Troy could withdraw the entire sum from the account once he reached age eighteen.
¶ 17. The chancellor relied on Hinds v. Primeaux, 367 So.2d 925 (Miss. 1979), in support of his decision to credit Ronnie with making child support payments. The Hinds decision involved crediting a father for trips and gifts in satisfaction of delinquent child support payments. Unlike the facts in Hinds, Ronnie had made no payments, gifts or trips to his son and the chancellor credited the father with payment of funds that Troy was individually, legally entitled to and further credited Troy's own money to Troy's court-ordered child support and credit gifts from Troy's grandfather to court-ordered child support payment owed by the father to the child.
¶ 18. As we are of the opinion that the chancellor committed manifest error in crediting the delinquent father, Ronnie Cleveland Mizell, for payments made with funds which *60 Troy Mizell was entitled to share in with his grandfather Cleveland Mizell, the chancellor's finding is reversed and this issue is remanded for a determination of the amount of child support Ronnie owes. This Court will not accept the taking of money from the account of the child and crediting the money as payment for the non-paying parent on child support.

Ronnie's Cross-Appeal
¶ 19. Ronnie contends the chancellor erred in assessing him with any arrearage of child support because 1) his relationship with Troy was "strained" and, 2) Troy became emancipated when he began junior college at the age of eighteen.
¶ 20. We reject both arguments. First, that a non-custodial parent's relationship with his or her child is "strained" does not release that parent from support obligations. Therefore, Ronnie had no right to terminate payment of support on the basis of strained relations with his son. Second, Troy continued to live with his mother after he began attending college, taking his meals at her home. Although he held part-time jobs at minimum wage, he was not self-emancipated as that term is defined in Pass v. Pass, 238 Miss. 449, 118 So.2d 769 (1960). See also Caldwell v. Caldwell, 579 So.2d 543, 548-49 (Miss. 1991).
¶ 21. Had Ronnie perceived a material change in Troy's circumstances, he could have sought a modification of the divorce decree. However, Ronnie could not unilaterally cease payment of support for Troy. With credit for payments from Cleveland Mizell, there remained an arrearage of $1440 ($40 a month for 36 months), which was properly awarded to Linda. Accordingly, we reject Ronnie's cross appeal.

II. THE CHANCELLOR WAS MANIFESTLY WRONG IN ALLOWING THE PRIOR DIVORCE DECREE TO BE MODIFIED WITH REGARD TO PAYMENT OF COLLEGE EXPENSES AND THE RIGHT TO PARTITION REAL PROPERTY.
¶ 22. Findings in support of child support rulings are reviewed under the manifest error/substantial evidence rule. Lawrence v. Lawrence, 574 So.2d 1376, 1382 (Miss. 1991). This Court does not have authority to reverse a chancellor's findings or awards absent a clear abuse of judicial discretion. Johnson v. Johnson, 550 So.2d 416 (Miss. 1989).
¶ 23. Within the context of child care and maintenance orders, "child support" refers to the sums of money which a parent is ordered to pay for the child's basic living expenses, namely food, clothing, and shelter. Other sums which a parent may be ordered to pay are the expenses of a college, or other advanced education. Nichols v. Tedder, 547 So.2d 766, 769 (Miss. 1989).
¶ 24. The chancellor awarded Linda the sum of $87.50, representing one-half of the college expenses incurred by Troy during his first five semesters at Gulf Coast Community College. Linda contends the chancellor erred in assessing her only one-half of Troy's college expenses. Ronnie counter-complains that he should not be compelled to pay for any of Troy's college expenses, because of Troy's poor academic performance.
¶ 25. The final judgment of divorce entered on July 18, 1984, required Ronnie "to pay all expenses in connection with the college education on behalf of [Troy], the minor child." Ronnie freely acknowledges that he did not pay the college expenses of his son. Troy admitted that, to a certain degree, he had not made satisfactory progress in school. Troy lived at home and worked part-time at various jobs while attending college in Gautier. After completion of nine semesters, the equivalent of four and one-half years, Troy had accumulated 40 hours which were transferable to a senior college.[1]
¶ 26. In the "Ruling of the Court" entered on September 5, 1991, the chancellor found as a fact that (1) Troy had been in Junior College for nine semesters, taking only minimal hours; (2) after registration, Troy would drop or withdraw significantly from the *61 courses in which he had enrolled; and (3) Troy's grades, while acceptable, were not exceptional. Taking into consideration the "totality of the circumstances" surrounding the issue of college expenses, the chancellor was constrained in "equity and good conscience" to find that Ronnie should only be responsible for five semesters for his share of Troy's college expenses, which represents a two-year program and one additional semester for any remedial or extra courses required to obtain his degree.
¶ 27. To justify changing or modifying the original decree, a chancellor must find there to be a material or substantial change in the after-arising circumstances of the parties. Shaeffer v. Shaeffer, 370 So.2d 240, 242 (Miss. 1979). In the case sub judice, the chancellor did not find a material or substantial change of circumstances to alter the decree, rather his decision was based largely upon Troy's academic progress in school. After reviewing the record in its entirety, it appears that the chancellor altered the decree without any showing by Ronnie that he was in a different position which rendered him unable to comply with the decree and pay his son's college expenses.
¶ 28. We find an abuse of discretion in the chancellor's assessment of $87.50 to each parent for Troy's educational expenses. In absence of findings of material or substantial change in circumstances which would have rendered Ronnie unable to pay the college expenses, the chancellor had no authority to modify or alter the decree. This issue is reversed and remanded for a determination of Troy's college expenses, which include not only the cost of tuition but also, books, lab fees and other related costs. On remand, Ronnie will tender an aggregate amount representing Troy's college expenses to Linda.

III. THE CHANCELLOR WAS MANIFESTLY WRONG IN FAILING TO AWARD WIFE 1/2 INTEREST IN LOTS 250 AND 251 OF WESTGATE ESTATES.
¶ 29. Linda claims the chancellor was manifestly wrong in failing to award her a one-half interest in each of two lots contiguous to the marital home. These lots, numbers 250 and 251 of the Westgates Estates Subdivision, were purchased by Ronnie and Linda in June of 1983, along with lot 249, and certain outbuildings located on Lots 253 and 254.[2]
¶ 30. The sales price for the three lots was $18,000, of which nearly $7,000 was supplied as a cash down payment, and the balance of $11,000 was financed at Singing River Credit Union. The down payment was made to the seller by a check drawn upon Ronnie's and Linda's joint account. At Ronnie's request, Linda executed a Deed of Trust to the Singing River Credit Union, making her liable with Ronnie for payment of the $11,000 indebtedness. Subsequently, Ronnie had the Warranty Deed prepared whereby the seller conveyed the lots to Ronnie only as owner in fee simple.
¶ 31. All payments made on the three lots from June 23, 1983, until the time of the divorce in July, 1984, were made from Ronnie and Linda's joint checking account, in which both deposited their paychecks. At the time of the divorce in 1984, Ronnie and Linda agreed to each pay one-half of the monthly note. Ronnie told Linda the deletion of her name from the warranty deed had been a typographical error, and that she and Ronnie co-owned the lots. With knowledge that he had not made Linda a joint owner of the three lots, Ronnie accepted 31 payments from Linda in an average amount of $150 a month, during the period of October 17, 1984 through May 14, 1987.[3] In addition, Linda wrote Ronnie three checks totaling $427 for 1985, 1986, and 1987 taxes on the property. Other taxes were paid by Ronnie.
¶ 32. Linda stopped her payments after learning that she had no ownership interest in the three lots. Through her attorney, Linda requested that she be made a joint owner. Ronnie refused to convey Linda an interest in the property; in her amended *62 complaint, Linda requested that the conveyance be reformed so as to reflect ownership as being one of joint tenancy by Linda and Ronnie with right of survivorship.

The Constructive Trust
¶ 33. The chancellor found as a fact that (1) Lots 250 and 251 are in the name of Ronnie Mizell only, with Lot 252 and the adjoining acreage in both names; (2) Linda has Lot 253 (the marital home) solely in her name and has exclusive use and possession of Lot 252 by the order of divorce; (3) both Ronnie and Linda have made payments as well as paid taxes on Lots 250 and 251; and (4) Linda incurred joint liability on a purchase money note by executing a Deed of Trust with Ronnie in favor of Singing River Credit Union. Subsequent to the filing of the suit before this Court, Ronnie and Linda entered into an agreement and resolved their dispute as to Lot 252.
¶ 34. Concluding that payment and/or title to these lots should be dealt with equitably, the chancellor found that Linda was entitled to a lien on Lots 250 and 251 in the amount of $4,650 plus interest, the amount she had paid to Ronnie. The chancellor also recognized a constructive trust in favor of Linda, whereby Ronnie held legal title to Lots 250 and 251 in trust for the use and benefit of Linda and Ronnie as joint tenants.
¶ 35. Linda claims that based upon the misrepresentations of Ronnie, the chancellor should have awarded her a one-half interest in Lots 250 and 251 instead of impressing a lien. Linda reasons that the two lots, which were purchased for $6,000 each, continue to increase in value and that Ronnie, upon the sale of these lots contiguous with the marital home, will enjoy a windfall. Linda says Ronnie can pay off the $4,650 lien, sell the lots for $20,000, and pocket the difference. This would produce a profit of $8,000 going solely to Ronnie.
¶ 36. The law of constructive trusts is set forth in Planters Bank & Trust Company v. Sklar, 555 So.2d 1024, 1034-35 (Miss. 1990), Allgood v. Allgood, 473 So.2d 416, 421 (Miss. 1985), and Sojourner v. Sojourner, 247 Miss. 342, 153 So.2d 803, 807 (1963). We pointed out in Planters Bank & Trust that a constructive trust is raised by equity to satisfy the demands of justice. We also said that "[a]ny transaction may provide an appropriate setting for creating a constructive trust where for any reason, one party holds funds `which in equity and good conscience should be possessed by' another party. Their forms and varieties `are practically without limit.'" Planters Bank & Trust Company v. Sklar, 555 So.2d at 1034. "Clear and convincing proof is necessary to establish a constructive trust." Id. at 1034.
¶ 37. In Sojourner v. Sojourner, supra, we stated:
A constructive trust is one that arises by operation of law against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy.
¶ 38. Although the chancellor stated in his ruling that he had "a serious question as to whether it can take the name of one person and put it on the title to another", the question of divestiture of title in a divorce case was settled in Draper v. Draper, 627 So.2d 302 (Miss. 1993), in which this Court abandoned the title theory of property. We explicitly stated that "the chancellor in a divorce case now has the authority to divest title from one spouse, and vest it in the other spouse, when equitably dividing the marital assets." Id. at 305.
¶ 39. There can be no doubt that Linda made a material and direct contribution to the purchase of Lots 250 and 251. Some of the contributions were made during the marriage in the form of payments from a joint account while the $4,650 was paid to Ronnie from Linda's account following the divorce. Thus, Lots 250 and 251 can be characterized as jointly accumulated mixed property but not jointly accumulated marital property. Linda signed the note on June 23, 1983, and payments were made from a joint account until the divorce was granted on July 18, *63 1984. Linda paid $4,650 to Ronnie from October of 1984 until April of 1987.
¶ 40. Divestiture of title is one means now available to a chancellor dividing property pursuant to equitable principles. However, it is not the only means by which to perform an equitable division of property, and the chancellor in this case did not believe it was available to him at the time of judgment, as his comments reveal. The chancellor instead used a lien and a constructive trust, to divide the property. We must remember that the lots were purchased during the marriage and were intended to be jointly owned property, thus both Linda and Ronnie were to enjoy or suffer the increase or decrease in value of the lots. The chancellor's order does not entitle Linda to enjoy any of the increased value (over the purchase price) of the lots. The chancellor's order only grants Linda a lien upon the lots in an amount representing her actual payments made toward the purchase of the lots. Where both parties financially contributed to acquisition of property, the chancellor may order and require both parties to receive an undivided one-half interest in that property. Brendel v. Brendel, 566 So.2d 1269, 1273 (Miss. 1990). See also, Hemsley v. Hemsley, 639 So.2d 909 (Miss. 1994), Ferguson v. Ferguson, 639 So.2d 921 (Miss. 1994). We find an abuse of discretion, and reverse and remand this issue. Linda's name shall be added to the deed of these lots as joint owner with Ronnie, so that each party will equally share in the increase in value of the lots.

Ronnie's Cross-Appeal
¶ 41. Ronnie counterclaims that the chancellor erred in imposing a constructive trust in favor of Linda on Lots 250 and 251, because no notice was given in the pleadings that such trust was being sought.
¶ 42. This argument is without merit. Linda's amended complaint alleged that Ronnie had undertaken a course of fraudulent conduct, which had induced her to make payments towards satisfaction of the indebtedness on the three lots. The amended complaint requested, as alternative relief, "that a lien be imposed upon real estate owned by Defendant [Ronnie] in favor of Plaintiff [Linda] in an amount equal to her equitable interest." Although the amended complaint did not contain the words "constructive trust," the circumstances, occurrences and events upon which Linda relied in support of her claim for an equitable lien were clearly set forth in the amended complaint. Ronnie was given adequate notice under our rules. Cf. PACCAR Financial Corporation v. Howard, 615 So.2d 583, 589-90 (Miss. 1993).
¶ 43. Ronnie also claims there was no basis for the granting of a lien on the property because the proof was inconclusive as to how much Linda was paid. This argument has no appeal because the proof clearly established, inter alia, that between October 17, 1984, and May 14, 1987, Linda made out to Ronnie, on her personal account, twenty-four checks for land payments in the total sum of $4,650, the amount of the lien impressed by the chancellor.

IV. THE CHANCELLOR WAS MANIFESTLY WRONG IN FINDING THAT HUSBAND HAD SATISFIED ALL MORTGAGE OBLIGATIONS ON THE MARITAL HOME FOLLOWING THE DIVORCE.
¶ 44. Linda claims that Ronnie owes her $362, the amount of one monthly installment on the marital home, because she paid the note for the month of November, 1984, after Ronnie had refused to do so.
¶ 45. Prior to Linda's purchase of Ronnie's interest in the marital home in December of 1984, the divorce decree required Ronnie to pay the monthly mortgage payments to Hancock Mortgage Company, including taxes and insurance. The amount of the monthly note to Hancock was $362. In the final judgment entered on April 21, 1992, the chancellor found that Ronnie had satisfied all mortgage payments for the year 1984 as ordered by the divorce decree. Ronnie had produced copies of 13 checks, each made out to the mortgage company in the amount of $362.
¶ 46. Linda alleges that following the divorce, Ronnie, who had the payment book, made the first mortgage payment but refused to make the second payment. According to Linda, Ronnie said: "If you don't want to lose your credit, you had better pay it, *64 because I'm not." Linda said she wrote a personal check for the house payment and mailed it to Ronnie so he could send it off with the payment stub.
¶ 47. Linda complains that even though Ronnie produced a canceled check showing that he made the payment in question, the origin of his payment was her own check to Ronnie, which she had written to protect her credit rating. However, Linda did not further develop this matter at trial. There was some uncertainty concerning the identity of the payee on the personal check mailed to Ronnie. Moreover, the date Linda mailed the check to Ronnie was never established. Finally, a copy of Linda's canceled check was never produced. The chancellor was compelled to weigh Linda's undeveloped testimony against Ronnie's canceled checks. We cannot say the chancellor was manifestly wrong in finding that Ronnie satisfied all mortgage payments for the year 1984.
¶ 48. "Under the standard of review utilized to review a chancery court's findings of fact, particularly in the areas of divorce, alimony and child support, this Court will not overturn the court on appeal unless its findings were manifestly wrong." Tilley v. Tilley, 610 So.2d 348, 351 (Miss. 1992). The evidence before the chancellor indicated that Ronnie made the mortgage payments as ordered by the final decree. Linda failed in her attempt to show otherwise.

V. THE CHANCELLOR WAS MANIFESTLY WRONG IN FAILING TO FIND HUSBAND IN CONTEMPT OF COURT.
¶ 49. The chancellor found that Ronnie had failed to pay child support and college expenses, and that he had canceled the life insurance ordered by the divorce court. Nevertheless, the chancellor did not find, based upon the proof and Ronnie's circumstances, that Ronnie was in willful contempt of the decree. The chancellor noted that some payments had been made.
¶ 50. Linda complains that the chancellor erred in failing to find that Ronnie's actions were contemptuous. Ronnie defended his failure to pay college expenses on the basis of (1) Troy's poor academic performance and (2) the fact that no demand for payment was ever made by Linda or Troy. He defended his failure to pay child support after Troy reached his eighteenth birthday (1) on the basis of Troy's strained relationship with his father and (2) because he had been advised by a lawyer that he did not have to pay child support once Troy attained the age of eighteen.
¶ 51. Linda says that Ronnie's defenses should be held for naught because his credibility was shown to be lacking. Resolution of this question, however, turns upon Ronnie's credibility and the weight and worth of his testimony, matters we will not undertake to examine on appeal. "[T]he chancellor is the judge of the weight and worth of the testimony" in a divorce proceeding. Dubois v. Dubois, 275 So.2d 100, 101 (Miss. 1973). See also Rainey v. Rainey, 205 So.2d 514 (Miss. 1967).
¶ 52. Contempt can only be willful. "A contempt citation is proper only when the contemner has wilfully and deliberately ignored the order of the court." Cooper v. Keyes, 510 So.2d 518, 519 (Miss. 1987), citing Millis v. State, 106 Miss. 131, 63 So. 344 (1913). It is a defense to a contempt proceeding that the person was not guilty of willful or deliberate violations of a prior judgment or decree. Dunaway v. Busbin, 498 So.2d 1218 (Miss. 1986).
¶ 53. In Milam v. Milam, 509 So.2d 864, 866 (Miss. 1987), we stated:
[W]e will not reverse the Chancellor upon a finding of fact short of manifest error, and none is present here. Contempt is to be determined upon the facts of an individual case and is a matter for the trier of fact. See Rubisoff v. Rubisoff, 242 Miss. 225, 133 So.2d 534 (1961) at 538.
See also Premeaux v. Smith, 569 So.2d 681, 683 (Miss. 1990). We do not find manifest error in this case, and accordingly affirm the chancellor.

VI. THE CHANCELLOR WAS MANIFESTLY WRONG IN AWARDING LINDA $1000 IN ATTORNEYS FEES.
¶ 54. In his ruling of September 5, 1991, the chancellor found "that the [Divorce] Decree was not fully complied with and necessitated *65 this action." The same observation was made in the Final Judgment entered on April 20, 1992. Accordingly, the chancellor awarded to Linda the sum of $1,000 as attorney's fees, together with all costs.
¶ 55. In his cross-appeal, Ronnie claims that Linda is financially able to pay her own attorney, and that the evidence presented in the lower court neither justified nor allowed an award of attorney's fees to Linda. Linda argues that she was forced to seek court intervention because of Ronnie's failure to comply with the court order.
¶ 56. The question of attorney's fees in a divorce action is a matter largely entrusted to the sound discretion of the trial court. Martin v. Martin, 566 So.2d 704 (Miss. 1990); Devereaux v. Devereaux, 493 So.2d 1310 (Miss. 1986); Kergosien v. Kergosien, 471 So.2d 1206, 1207 (Miss. 1985). As we recently stated:
We are reluctant to disturb a chancellor's discretionary determination whether or not to award attorney fees and of the amount of [any] award.
Smith v. Smith, 614 So.2d 394, 398 (Miss. 1993), citing Geiger v. Geiger, 530 So.2d 185, 187 (Miss. 1988).
¶ 57. In Moore v. Moore, 372 So.2d 270, 272 (Miss. 1979), we held that a divorced wife who brought an action against former husband for failure to make child support payments was entitled to an award of $1,170 in attorney's fees, even though husband's default was not accompanied by a finding of contempt. Attorney's fees are the responsibility of the person required to make child support payments. Pearson v. Hatcher, 279 So.2d 654, 656 (Miss. 1973).
¶ 58. Perhaps, as Ronnie alleges, Linda could have afforded to pay her own attorney. Nevertheless, the chancellor found that Ronnie's actions necessitated the institution of legal proceedings. An itemized statement of legal services rendered by Linda's lawyer was introduced at trial. Her lawyer also testified concerning his services and $975 fee.[4] We find no abuse of judicial discretion in the $1,000 award of attorney's fees to Linda, and affirm.

CONCLUSION
¶ 59. Linda appealed the chancellor's order and asserted that the chancellor committed manifest error or an abuse of discretion: (1) in allowing credit for child support for monies paid by the paternal grandfather; (2) in ordering Linda to pay one-half of Troy's college expenses in contradiction of the divorce decree; (3) in failing to award Linda a one-half interest in property, jointly acquired by the parties; (4) in finding that Ronnie had met all mortgage payment obligations; (5) in failing to find Ronnie in contempt of court. We find that the chancellor abused his discretion: in crediting the delinquent father, Ronnie Cleveland Mizell, for payments made with funds which Troy Mizell was entitled to share in with his grandfather, Cleveland Mizell; in having altered the divorce decree in absence of the necessary showing of a material change of circumstances; in ordering Linda to pay one-half of Troy's college expenses. Further, we find the chancellor in error for only allowing an interest in Lots 250 and 251 equal to her financial contribution. On the remainder of the issues, we affirm. On remand, Ronnie is to pay the full amount of child support arrearage, Troy's college expenses, $ 1,000 in attorney's fees, and the chancellor is to order that Linda be given an equal joint interest in Lots 250 and 251.
¶ 60. AFFIRMED IN PART; REVERSED AND REMANDED IN PART.
PRATHER, C.J., PITTMAN, P.J., and SMITH, MILLS and WALLER, JJ., concur.
McRAE, J., dissents with separate written opinion.
BANKS, J., concurs in part and dissents in part with separate written opinion joined by SULLIVAN, P.J.
McRAE, Justice, dissenting:
¶ 61. I disagree with the majority's findings as to Issues I and III and, instead, would affirm the decision of the chancery *66 court. Further, I agree with the chancellor's conclusion that Ronnie's responsibility for Troy's college expenses should be limited. Accordingly, I dissent.
¶ 62. The majority finds that Linda should have been awarded a one-half interest in lots 250 and 251 of Westgate Estates rather than receiving an equitable lien against the property. However, this appeal arises not from a divorce proceeding, but a contempt proceeding addressing matters which arose subsequent to the divorce. Even if Linda paid more than her fair share of the monthly payments for the property and property taxes after the divorce, as she alleges, she will recoup, with interest, every penny she paid directly to Ronnie following the divorce. More importantly, the divorce was granted in 1984. Final judgment in this case was entered in April, 1992. The chancellor, at either time, did not have the benefit of this Court's decisions in Draper v. Draper, 627 So.2d 302 (Miss. 1993), Hemsley v. Hemsley, 639 So.2d 909 (Miss. 1994) and Ferguson v. Ferguson, 639 So.2d 921 (Miss. 1994). Even if he did, the law of those cases cannot be applied to the terms of a decree that is now res judicata. That decree now can only be modified. The chancellor therefore cannot be said to have abused his discretion in establishing a constructive trust and granting Linda an equitable lien against it.
¶ 63. The majority further finds that Ronnie is not entitled to credit as child support for money his son received from an account set for him by his paternal grandfather. Between his eighteenth and twenty-first birthdays, Troy received some $5,800 from his grandfather placed in a joint account. He testified that his grandfather gave him the money for truck payments since he needed transportation for work and school. Cleveland Mizell, Troy's grandfather, testified that the intent of the payments was to assist his son, Ronnie Mizell, with his financial obligations. Based on the chancellor's decision to allow those monies to satisfy Ronnie's $1,400 arrearage, the chancellor clearly accorded some weight and credence to the senior Mizell's testimony.
¶ 64. The credibility of witnesses in a divorce proceeding and the weight of their testimony is a matter for the chancellor's determination. Dubois v. Dubois, 275 So.2d 100, 101 (Miss. 1973). See also Rainey v. Rainey, 205 So.2d 514, 515 (Miss. 1967). Stated somewhat differently, "[t]he trial judge, sitting in a bench trial as the trier of fact, is the exclusive authority for determining witnesses' credibility." Planters Bank & Trust Co. v. Sklar, 555 So.2d 1024, 1033 (Miss. 1990). This Court, as an appellate court, is charged with viewing the trial record in its entirety and accepting "that evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inference which may be drawn therefrom and which favor the lower court's finding of fact." Cotton v. McConnell, 435 So.2d 683, 685 (Miss. 1983) (quoting Culbreath v. Johnson, 427 So.2d 705, 707-708 (Miss. 1983)). Thus, even though we may not totally agree with the chancellor's findings, we must follow his decision when it is supported by the evidence in the record.
¶ 65. The majority further falls short in its efforts to distinguish this case from Hinds v. Primeaux, 367 So.2d 925 (Miss. 1979), upon which the chancellor relied. In Hinds, the father was credited for trips and gifts in satisfaction of delinquent child support payments. The majority correctly states that Ronnie made no payments or gifts to his son, Troy. However, it erroneously labels those funds paid monthly into the joint account set up by Troy's grandfather as gifts from the grandfather and as money "already belonging to the child." The styling of the account was indicative only of the source of the funds; it provided a convenient means to put money into an account for the boy and did not make him half owner of the funds. In vesting the child with "ownership" of the funds, the majority fails to take into consideration the testimony by Ronnie and the grandfather that the money was a loan, which Ronnie was in the process of repaying. Moreover, as long as support obligations were met, it does not matter whether they were satisfied by Ronnie or the senior Mizell. Troy received support, albeit indirectly, from Ronnie, who used the grandfather both as a source and a conduit. To require Ronnie to pay the credited *67 amount to Linda would unjustly enrich both Troy and Linda.
¶ 66. I further would affirm the limitation of Ronnie's responsibility to five semesters of his son's college expenses. It stretches the imagination to think that the original decree intended for Ronnie to pay Troy's college expenses for the nine semesters he was enrolled. Taking only two courses a semester hardly qualifies one as a full-time academic student, but simply as one with too much time to play. The chancellor's ruling was not manifestly in error.
¶ 67. The majority essentially has reviewed this case de novo. Because there is substantial evidence in the record to support the chancellor's findings, I would find, however, that we are compelled to affirm his decision. Accordingly, I dissent.
BANKS, Justice, concurring in part and dissenting in part:
¶ 68. I concur with the majority's resolution of all issues except that involving college expenses.
¶ 69. The majority opinion appears to confine the issue of whether there has been a change in circumstances which should warrant a modification of a decree requiring the payment of college expenses to a change affecting the ability of the affected parent to pay. In my view, other circumstances, including a change in the state of knowledge concerning the child's aptitude for or attitude towards college work, may come into play in determining whether it remains equitable to provide support. While the chancellor did not expressly hold that he was finding a material change in this regard, that is a finding that can be assumed from the action taken. See Dufour v. Dufour, 631 So.2d 192, 194-95 (Miss. 1994) (citing Pace v. Owens, 511 So.2d 489, 492 (Miss. 1987)).
¶ 70. Beyond that, however, I do not believe that the original decree in this case should be interpreted to require support for non-productive work. We have said that decrees requiring the payment of college expenses, while enforceable, should be given a reasonable interpretation. See Rogers v. Rogers, 662 So.2d 1111, 1115-16 (Miss. 1995). It should not take nine semesters to complete work at a community college which normally has a four-semester curriculum. The chancellor's allowance of five semesters is, in my view, within the range of what is reasonable. I agree with the majority, however, that college support goes beyond tuition.
¶ 71. In conclusion then, whether it flows from an implicit finding of a change in circumstances or a reasonable interpretation of the original provision, I do not believe that the chancellor erred with respect to limiting the temporal scope of the college expenses requirement. To the extent that the majority says otherwise, I disagree. I would reverse and remand for a determination of the amount necessary to fully pay for five semesters.
SULLIVAN, P.J., joins this opinion.
NOTES
[1] Troy had completed 52 hours of studies, including 12 hours of D's, which were nontransferable.
[2] Ronnie later deeded Lot 249 to his father, Cleveland Mizell. The ownership of Lot 249 is not an issue in this appeal.
[3] The Deed of Trust required that the sum of $11,000 be repaid over 48 months at a rate of $291.71 a month. Linda therefore paid $4.15 a month more than her share.
[4] Linda had also paid a $500 retainer to her first attorney.