963 So.2d 1235 (2007)
Robin Chastity JORDAN, Appellant
v.
Howard Ray JORDAN, III, Appellee.
No. 2005-CA-01834-COA.
Court of Appeals of Mississippi.
August 14, 2007.
*1238 William R. Wright, Jackson, W. Benton Gregg, attorneys for appellant.
James R. Hayden, Hattiesburg, attorney for appellee.
Before LEE, P.J., BARNES and CARLTON, JJ.
BARNES, J., for the Court.
¶ 1. This case comes on appeal from the order of the Perry County Chancery Court, granting joint legal custody to Howard Ray Jordan (Ray) and Robin Chastity Jordan (Robin) of their three minor children, with sole physical custody to Ray, and denying Robin's claim of right to the marital home. After thorough review of the record, we affirm the judgment of the chancery court.

SUMMARY OF FACTS AND PROCEDURAL HISTORY
¶ 2. Howard Ray Jordan and Robin Chastity Jordan were married on September 17, 1994. During their first years of marriage, Ray and Robin lived in a mobile home on a tract of land that Ray's parents owned. Ray and Robin later began to build a home on the property with Ray's parents, Ray Sr. and Linda Jordan, providing funding to purchase the building materials for the house. On December 27, 2002, Ray's parents deeded the parcel of land to him via warranty deed. This deed was subject to a reversionary interest in the grantors (Ray's parents) should Ray ever convey the property, mortgage the property or grant a security interest through a deed of trust, or file, or have served upon him, a divorce proceeding. Ray and Robin lived together as husband and wife until June 11, 2004, when they separated. Ray and Robin have three children: Caden R. Jordan (Caden), born on September 12, 1995; Chastity Shae *1239 Jordan (Chastity), born on September 16, 1998; and Summer R. Jordan (Summer), born on June 7, 2000.
¶ 3. On June 11, 2004, Ray filed a complaint for divorce against Robin in Perry County Chancery Court. The chancellor issued an order June 30, 2004, awarding temporary custody of their three minor children to Ray until the trial. Robin filed an answer to the complaint and later submitted a motion to set aside the temporary order. At the trial, held August 2, 2005, the chancery court awarded sole physical custody of the three minor children to Ray, while both Ray and Robin retained joint legal custody. In addition, the chancellor awarded Ray the entirety of the marital home. From the judgment, Robin now appeals asserting that she should have been awarded sole physical custody of their three minor children and she should have been granted a financial interest in the marital home.

STANDARD OF REVIEW
¶ 4. Our scope of review in domestic relations matters is limited by the substantial evidence/manifest error rule. Mizell v. Mizell, 708 So.2d 55, 59(¶ 12) (Miss. 1998) (citing Stevison v. Woods, 560 So.2d 176, 180 (Miss.1990)). "This Court will not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." Bell v. Parker, 563 So.2d 594, 596-97 (Miss.1990). This Court is required to respect the findings of fact made by a chancellor which are supported by credible evidence and not manifestly wrong. Newsom v. Newsom, 557 So.2d 511, 514 (Miss.1990). This is particularly true "in the areas of divorce and child support." Mizell, 708 So.2d at 59(¶ 13) (quoting Nichols v. Tedder, 547 So.2d 766, 781 (Miss.1989)).
I. WHETHER THE CHANCERY COURT ERRED IN AWARDING SOLE PHYSICAL CUSTODY OF THE THREE CHILDREN TO RAY JORDAN BASED ON THE COURT'S ANALYSIS OF THE ALBRIGHT FACTORS.
¶ 5. In determining the issue of child custody, the chancellor used twelve factors set forth in Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983), which states,
[T]he polestar consideration in child custody cases is the best interest and welfare of the child. The age of the child is subordinated to that rule and is but one factor to be considered. Age should carry no greater weight than other factors to be considered, such as: health, and sex of the child; a determination of the parent that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness of parents; the home, school and community record of the child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each parent, and other factors relevant to the parent-child relationship.
Id. Of the twelve factors, the chancellor in this case found four factors to be neutral, one to be inapplicable, one in favor of Robin (continuity of care) and the remaining six factors to favor Ray. Unless a chancellor "improperly considers and applies" the factors in Albright, an appellate court will not disturb the chancery court's *1240 findings. Hollon v. Hollon, 784 So.2d 943, 946(¶ 11) (Miss.2001). We will review each factor in this appeal and the chancellor's analysis of these factors.
I. Age, health and sex of the child.
¶ 6. Robin and Ray have three children: Caden, a male, ten years of age at the time of trial; Chastity, a female, six years of age; and Summer, a female, five years of age. The chancellor favored neither parent on this factor. Robin maintains that one reason this factor should have favored her was Caden's diagnosis of attention-deficit disorder. In her testimony at trial, Robin stated that she took care of Caden's doctor visits and medicine but Ray had not agreed with Caden's diagnosis and medical care, insinuating Ray was not meeting Caden's healthcare needs. However, Robin made no specific assertions at trial that Ray was not giving Caden his medication for his disorder, so we find no error on the chancellor's findings of fact.
¶ 7. Secondly, Robin says this factor should favor her since her youngest child, Summer, who had just turned five years old at the time of the trial, was of "tender years." Citing Hollon and Sobieske v. Preslar, 755 So.2d 410, 413(¶ 10) (Miss.2000), Robin argues that the chancellor abused his discretion in finding that this factor favored neither parent since there is a presumption in Mississippi that a mother is generally better suited to raise a child of tender years. The Sobieske court also stated, however, that this presumption has been significantly weakened. Id. Today, the age of a child is merely one of the many factors that the court considers in determining the best interests of the child. Albright, 437 So.2d at 1005. What actually constitutes a child of tender years, however, has not been clearly defined in the courts. "[A] child is no longer of tender years when that child can be equally cared for by persons other than the mother." Mercier v. Mercier, 717 So.2d 304, 307(¶ 15) (Miss.1998). In Lee v. Lee, 798 So.2d 1284, 1289(¶ 18) (Miss.2001), the court stated that a child over four years may not be subject to the "tender years" doctrine. Although Summer was barely five, it was likely she was eligible to begin pre-school, indicating she was of an age where she could be cared for by someone other than her mother. Even though the lower court did not give a thorough explanation of its analysis of this particular factor, we find no error based on the evidence given.
ii. Continuity of Care
¶ 8. The lower court favored Robin on this factor. Therefore, Robin brings no issue as to this factor.
iii. Parenting skills
¶ 9. The chancery court ruled in favor of Ray on this factor citing testimony from witnesses that Robin was not a good housekeeper and she was "a moody, short-tempered and aggressive person who lacked patience." Robin argues that the chancellor ignored testimony regarding her significant contributions to the children's educational, medical and social needs. Specifically, she again points to Caden's learning disability and Ray's reluctance in the treatment of the condition. The evidence showed, however, that Ray was willing to help Caden, going so far as to take him to a tutor for his schoolwork.
¶ 10. The chancellor commented that Robin's housekeeping was evidence that she was "delinquent" in her duties as a parent. Although the testimony at trial *1241 showed that Robin did not necessarily keep her house in pristine condition, it presented no evidence that the family lived in unhealthy conditions. Unfolded laundry and toys strewn on the floor are insufficient grounds to label someone an unfit parent. Even Ray's mother, Linda, testified that she did not think Robin's lax housekeeping skills made her an unfit mother.
¶ 11. On this same factor, Robin also points to testimony that Ray also exhibited aggressive behavior, which included verbal abuse directed towards her, in front of the children. We find that the testimony presented several instances of aggression on the part of both Ray and Robin. Robin was occasionally short-tempered with her children, and Ray was sometimes demanding and aloof, preferring to spend time in his shop.
¶ 12. Although Robin's lack of housekeeping skills may have been given too much weight by the chancery court, we do not agree that this factor necessarily favors Robin in any respect. Thus, we find no error in the chancellor's analysis of the facts on this issue.
iv. Willingness and capacity to provide primary care
¶ 13. The chancery court found that this factor favored Ray although both parents expressed the desire and willingness to provide primary care for their children. The chancellor based his findings on the fact that Ray has a full-time job with the family-owned plumbing business, which provided more flexibility as to his work hours, and a nicer home (the marital home). Robin, on the other hand, had a two-bedroom apartment and a part-time job.
¶ 14. Robin also asserts the chancellor's discussion regarding Ray's employment was out of place in the determination of this factor. We disagree, as employment can be evidence of a parent's capacity to provide care for his or her children. However, "[t]his Court is not aware of any authority for the proposition that the parent earning a greater income is entitled to some preference in a custody dispute based solely on that consideration." Johnson v. Johnson, 872 So.2d 92, 95(¶ 12) (Miss.Ct.App.2004). Robin reasons that, although Ray has a better job, she has the capacity to care for the children as she has done since they were born. Ray, however, testified that he was the one who bathed and fed the children the majority of the time.
¶ 15. Robin notes that the fact Ray has the larger home should not be a factor as the chancellor had not even ruled on who actually owned the home. We find that argument, while factually true, not persuasive. Whether Ray or his parents own the home, it was apparent that Ray would continue to live there despite the outcome. At the time of trial, Robin resided in a small apartment which was obviously less suitable than what Ray could provide.
¶ 16. While we understand Robin had more time to spend with her children, it does not outweigh Ray's superior capacity to support his children financially. The chancellor correctly found that Ray's flexible work schedule and unlimited family support favored Ray in this area.
v. Employment of the parents and responsibilities of employment.
¶ 17. The chancellor found this fact to be neutral and favored neither party. Robin states this should have been a *1242 factor in her favor since she has more time to spend with the children as she only has a part-time job, even though she expects to search for full-time employment in the future. She argues that Ray's job only means that his mother will take care of the children. However, the chancellor correctly applied the facts to the standard here. Ray's financial stability and flexibility at his job was balanced against Robin's ability to spend more time with the children due to her part-time job. Therefore, we find no error in this analysis.
vi. The physical and mental health and age of the parents
¶ 18. Although Ray was favored on this factor, Robin does not challenge the chancellor's finding.
vii. The emotional ties of parent and child
¶ 19. This factor was found to be neutral, and Robin does not challenge this finding.
viii. Moral fitness of the parents.
¶ 20. The chancellor found that this factor favored neither Ray or Robin. Both parties admitted to having extra-marital affairs. The chancery court acknowledged that, although Robin smoked in front of the children and occasionally went to bars, she did take them to church regularly. Robin argues that this should have been a factor in her favor since it was noted that Ray had a regular drinking habit and rarely went to church. There was no testimony from either party, however, that the children were exposed to any drunken behavior by either parent. Robin also asserts that Ray's denying her access to her children for three weeks was another factor that should disfavor him.[1] Ray testified that he was concerned about Robin's leaving the state with the children and that he overheard her say that she was "not going to let me see my kids." He also noted that he did let the children talk to her on the telephone during that period. Obviously, separations and divorces are very emotional and painful for all parties, and it is clear, upon review of the record, that neither parent exhibited exemplary behavior during this trying time. We find no error in the chancery court's finding that this factor favored neither party.
ix. Home, school and work record of the child.
¶ 21. The chancellor favored Ray for this factor, basing his finding on the fact that Ray can keep the children in the same school and home where they have always resided. Robin argues that the court would not allow her an interest in the marital home; therefore, this argument is unfair. We agree and find it unfair to ask a spouse to leave the marital home and then use that factor to also deny him or her custody of the child. See Lee, 798 So.2d at 1291 (¶28).
¶ 22. There were, however, other facts the chancellor considered in his analysis under this factor. The chancellor was concerned with Robin's plan to take the children and move to Alabama. Robin states that the chancellor's statement was speculation and not supported by the evidence. While Robin admitted she and her mother made plans to take the children to Alabama, *1243 she also testified that she had no plans to move to Alabama on a permanent basis. Ray stated that he heard Robin make specific plans to take the children and move to Thomasville, Alabama and that Robin was trying to arrange a job transfer and rent a house there. Other evidence presented to support the chancellor's concern was the fact that Robin had relatives and a boyfriend in Alabama. However, while Robin also had relatives and a part-time job in the local area, she did admit that she intended to remove the children from their current school and enroll them in a neighboring school district.
¶ 23. We find the chancellor's analysis of the facts proper. Ray planned to keep the children in the same home and school whereas Robin, even if she stayed in Mississippi, would still have to move the children to smaller living quarters and a new school. Even though there was conflicting testimony as to Robin's intention to move to Alabama, we will not disturb the chancellor's findings of fact as they are not clearly erroneous.
x. The preference of the child at an age sufficient to express a preference by law.
¶ 24. This factor was not applicable as all of the children were under twelve years of age.
xi. Stability of home environment.
¶ 25. The chancellor favored Ray regarding this factor. The chancellor again stated that, with Ray, the children would be able to remain in their home and school and stay close to their relatives. The court determined that "[s]hould Robin retain custody, however, there is no guarantee that they will live in adequate housing, they will be uprooted from their surroundings, and possibly be forced to move to urban Alabama." We agree with the chancellor that Ray would provide the children with a more stable home environment.
¶ 26. Robin makes the comment in her brief that Ray's family is very "clannish." We do not necessarily find this to be a negative consideration. In Neville v. Neville, 734 So.2d 352, 355(¶ 10) (Miss.Ct. App.1999), we held that the presence of an extended family can contribute to the stability of a child's life and is a legitimate factor that can give weight in a custody determination. In this case, the record reflects that the children's life with Ray is more stable and well-rounded. They are able to stay in the same school, play with cousins, ride horses and go on family vacations. We find no error.
xii. Other relevant factors
¶ 27. The chancellor said that Robin's use of prescription medication indicated she may have developed an addiction. He based this statement on records of doctor visits, number of prescriptions and testimony by Ray that Robin would be sleeping when he got home and left the children unattended. The chancellor also stated that Robin appeared to have a problem with stress which was detrimental to her health. Robin has ulcerative colitis which she needs to treat occasionally. She also admitted to taking anti-depressants but stated that she did not take them on a regular basis. It does appear from the record that Robin's doctor visits and prescriptions were excessive. Robin noted in her brief that some of the records were medical visits of the children. While true, the testimony at trial revealed that the majority of the drug records were Robin's. Ray testified that "the cabinet was full of *1244 different medications." Ray, on the other hand, had no history of health issues or depression. Based on the testimony and evidence presented at trial, we cannot find that the chancellor erred regarding this factor.
¶ 28. In conclusion, we do not find the chancellor's analysis of the facts cumulatively caused any overall substantial injustice towards Robin. None of the factors at issue on appeal favored Robin. In child custody cases, the best interest of the child must be kept paramount. Powell v. Ayars, 792 So.2d 240, 244(¶ 11) (Miss. 2001); Sellers v. Sellers, 638 So.2d 481, 485 (Miss.1994). The chancellor found that Ray was in a better position to serve the best interests of the three children. We find no manifest error in this determination and affirm the chancery court's judgment in awarding sole physical custody to Ray.
II. WHETHER THE CHANCERY COURT ERRED IN DENYING ROBIN AN EQUITABLE INTEREST IN THE MARITAL HOME?
¶ 29. Although Robin was awarded some marital assets,[2] she argues that the chancellor erred by not awarding her an equitable interest in the marital home.[3] Robin has asked this court to remand on this issue due to the chancellor's failure to set forth adequately findings of fact and conclusions of law. For this Court to assess properly the lower court's ruling, we must have before us in the record the basis for its ruling. Only then can we pass judgment on that ruling. Dorman v. Dorman, 737 So.2d 426, 431(¶ 12) (Miss.Ct.App.1999).
¶ 30. The chancellor cited Drumright v. Drumright, 812 So.2d 1021, 1026(¶ 9) (Miss.Ct.App.2001), for the proposition that in determining entitlement to interest in a marital asset, the court must look to the relative contributions of the parties to the asset to determine the equitable distribution of a marital estate. The chancellor found that Ray and his family actually built the home, with Ray's parents providing both the land and the money to purchase the building materials. Robin's "only contribution was aiding in the designing of some of the rooms, and some decorating."
¶ 31. Next, the chancellor discussed the reversionary clause in the warranty deed[4] and noted that the "property is to revert back to the grantors in the event of a divorce, which is now the case." The court concluded that based upon Robin's "questionable" status as a homemaker, under the prior Albright analysis, and her limited work history, her claim for an equitable *1245 interest in the marital home was "speculative at best" and "at worst non-existent because of the reversionary clause." Under the unique circumstances of this case, we cannot find that the trial court erred in its decision not to award Robin any equitable interest in the home.
¶ 32. Assets acquired or accumulated during a marriage are subject to equitable division unless it can be proved that such assets are attributable to one party's separate estate prior to the marriage or outside the marriage. Hemsley v. Hemsley, 639 So.2d 909, 914 (Miss.1994). Robin argues that the chancellor erred in not determining whether the home was marital or non-marital. Boutwell v. Boutwell, 829 So.2d 1216, 1221(¶ 19) (Miss. 2002). In this case, however, the court was obviously uncertain as to the ownership status of the marital home due to the reversionary clause. Therefore, the chancellor ruled in the alternative stating that either Robin's interest was non-existent because of the reversionary clause in the warranty deed, or her interest was "speculative" due to his interpretation of Robin's contributions to the home, should title still belong to Ray.
¶ 33. While Robin claims that the reversionary clause was a "sham" due to Ray's continued occupancy of the home, nowhere does she cite any legal authority as to why the clause should not be held valid. From the language of the warranty deed given to Ray by his parents, it is evident that the elder Jordans wanted to restrict any claim that a third party may have on the property should Ray's marriage dissolve or the property be transferred or encumbered. Their desire was understandable as Ray's parents did not take a deed of trust on the property and only a portion of the construction debt had been repaid. Further, many of the neighboring parcels of land were also owned by members of the Jordan family. "The first rule of interpretation of contracts is to follow the intent of the parties." Smith v. Smith, 656 So.2d 1143, 1147 (Miss.1995). The purpose of such clauses in a deed is to protect the property. While the purpose of the deed was to give Ray and his family a place to live, the language of the deed shows a strong intent not to let the property pass outside of the Jordan family, whether by mortgage, transfer or divorce. We note that this case is not one where Ray, as owner of the property, transferred title to a third party in an attempt to keep Robin from obtaining her rightful share. Ray's ownership of the property was subject at all times to conditions.
¶ 34. Under Mississippi law, "upon a breach and nonperformance of a condition annexed to the grant of a freehold estate the title conveyed is not void, but is only voidable by the acts of the grantor." Yazoo & M.V.R. Co. v. Lakeview Traction Co., 100 Miss. 281, 294, 56 So. 393, 396-97 (1911). The grantor may then exercise his right to re-enter the property or some act manifesting an intent to terminate the estate within the prescribed statutory period. Id. While Ray still retains record title to the property, this title is defeasible as the condition entitling the grantors to regain possession has occurred. Specifically, Ray's parents have the legal right to dispossess Ray of his enjoyment of the home, and that right will continue for the statutory period of ten years. See Miss.Code Ann. section 15-1-7 (Rev.2003). Therefore, Ray's continued presence at the marital home is not one of right, but a continuing gift to Ray by his parents.
¶ 35. Although the chancellor failed to make any specific ruling as to *1246 whether the reversionary clause was valid or who held title to the land in question, we find this was not an abuse of discretion.[5] This Court has held that "title is no longer determinative in deciding a party's rights to the property." Parsons v. Parsons, 741 So.2d 302, 307(¶ 26) (Miss.Ct. App.1999). A chancellor has the authority to look beyond mere legal title to make an equitable division of property acquired during the course of the marriage by the joint efforts of the parties or by the individual effort of either one of them. Pucylowski v. Pucylowski, 741 So.2d 998, 1001(¶ 11) (Miss.Ct.App.1999) (citing Ferguson v. Ferguson, 639 So.2d 921, 927 (Miss.1994)). "The chancery court is authorized to call for an equitable division of jointly accumulated property and in doing so to look behind the formal state of title." Hensarling v. Hensarling, 824 So.2d 583, 590(¶ 20) (Miss.2002). As the chancellor noted at the start of trial, the court "has certain flexibility in deciding how the Court divides marital interest in cases." Even if the chancellor found that Robin had a marital interest in the home titled to a third person, he could have ordered equitable compensation for her interest to be paid from another asset. Here, the chancellor found that Robin was not entitled to any equitable interest.
¶ 36. "Assets which are classified as non-marital, such as inheritances, may be converted into marital assets if they are commingled with marital property or utilized for domestic purposes, absent an agreement to the contrary." Boutwell 829 So.2d at 1221(¶ 20) (Miss.2002) (citing Heigle v. Heigle, 654 So.2d 895, 897 (Miss. 1995)). If a home is considered a marital asset, a chancellor employs the factors set forth in Ferguson, 639 So.2d at 928, to determine the equitable distribution. These factors are:
1. (a) Direct or indirect economic contribution to the acquisition of the property; (b) Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and (c) Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.
2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.
3. The market value and the emotional value of the assets subject to distribution.
4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;
5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;
6. The extent to which property division may, with equity to both parties, be *1247 utilized to eliminate periodic payments and other potential sources of future friction between the parties;
7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,
8. Any other factor which in equity should be considered.
We note here that, although we would have preferred that the chancellor had gone through a more detailed analysis of the factors in Ferguson, based on the unique nature of the case, his Albright analysis was sufficient to determine Robin's contributions and her right to any equitable interest in the home. In a division of property, the court must consider the economic contributions made by each party to the marriage, "both in terms of actual money earned and in terms of service without compensation such as domestic duties." Bresnahan v. Bresnahan, 818 So.2d 1113, 1119(¶ 13) (Miss.2002). The court concluded that, based on Robin's "questionable" status as a homemaker under his previous Albright analysis, and Robin's limited work history, her claim for any equitable interest in the marital home was "speculative at best." The testimony reflects this finding showing that Robin worked minimally outside the home earning very little income and her skills as a homemaker were unsatisfactory.
¶ 37. As to any direct or indirect contribution to the acquisition of the marital home, Ray and Robin lived in a mobile home on Ray's parents' property for approximately five years without paying rent. In 1997, they began constructing a house on the property, and, in 1999, Ray, Robin and their children moved into their newly built home. Ray's parents loaned the couple the money to build the home on the land.[6] It is unclear from the records exactly how much Ray and Robin paid in total on the loan to Ray's parents. Robin stated that they paid rent or mortgage on the house "for quite a few years." Ray's testimony is that they paid "a little." What is known is that Ray, Robin, and their children lived for several years on Ray's parents' land essentially rent-free. Sometime later, although testimony does not give us an exact date, Robin went to Ray's parents and told them she might have to apply for food stamps as she could not make ends meet. According to Robin, they "swiped it (the debt) clean" and said that Ray and Robin did not have to pay anything further on the loan/mortgage. Ray's mother even gave Robin an extra $1,000 to assist them. However, Ray testified that his parents had not waived future payments on the loan and even listed a $64,000 mortgage debt owed to his father on Ray's statement of assets. Linda, Ray's mother, also testified that when she and Ray Sr. discussed suspending the payment of the loan, Ray Sr. said that Ray and Robin could pay the loan back when they were older and could afford it. It was at this point that Ray's parents gave Ray the warranty deed for the land and its improvements upon which Ray and Robin lived so that Ray and Robin could apply for homestead exemption. Robin's name was not mentioned on the deed, nor was she a party to the transaction.
¶ 38. Upon review, it appears that neither Ray nor Robin contributed significantly to the acquisition of the marital home, although Ray could possibly have a *1248 claim of "sweat equity" through his physical labor on the house. Ray's parents let them live on their land and build a home for very little monetary consideration on the part of Ray or Robin. Robin even stated in her testimony she believed Ray "contributed zero too." Under the unique circumstances of this case, we cannot find that the chancery court erred in its decision not to award Robin any equity in the home. Ray is subject to being dispossessed by his parents at any time due to the reversionary clause, and neither contributed significantly to the acquisition of the home. We find that the chancellor's division of the marital home was equitable based on the record and his findings of fact, and Robin's assignment of error is without merit.
¶ 39. THE JUDGMENT OF THE CHANCERY COURT OF PERRY COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
NOTES
[1] Ray obtained a temporary injunction on June 21, 2004, to prevent Robin from leaving the State of Mississippi with the children.
[2] Robin was awarded one-half of Ray's IRA (which half equaled approximately $3,500), one-half of Ray's 401K (which half equaled approximately $5,000), one-half of the household furniture (except the children's belongings), and a 1995 Jeep Grand Cherokee.
[3] The home was estimated at a value of $100,000 although no appraisal was done. The chancellor used the appraisal amount listed on the homestead exemption application as agreed to by both parties.
[4] The warranty deed stated:

This conveyance is subject to a reversionary interest, and possibility of reverter in the grantors. If, during the lifetime of either of the grantors, the grantee conveys this property or any interest therein, mortgages the property or grants a security interest through a deed of trust in this property, files or has served upon him a divorce proceeding, then title to this property shall revert to the grantors, or either of them who shall be living at that time.
[5] At the start of trial, counsel for Ray requested that the elder Jordans be made parties to the proceedings due to their property interest or, alternatively, to prohibit Robin from making any claim to the property. The court denied the request due to the timing of the request (on the day of trial) and the fact that either party could have been joined Ray's parents prior to that time.
[6] Ray's mother, who was the bookkeeper at the family plumbing business, deducted fifty dollars from Ray's paycheck for payment on the debt.