946 So.2d 764 (2007)
R.K.
v.
J.K.
Nos. 2005-CA-01267-SCT, 2006-CA-00411-SCT.
Supreme Court of Mississippi.
January 4, 2007.
*768 Thomas W. Crockett, Jackson, attorney for appellant.
John Benton Clark, Brandi N. Smith, Thomas Ray Julian, Jackson, attorneys for appellee.
EN BANC.
SMITH, Chief Justice, for the Court.
¶ 1. Before this Court are two domestic relations cases which have been consolidated on appeal from the Hinds County Chancery Court. Both cases concern the Property Settlement and Child Custody and Support Agreement (Agreement) between Plaintiff R.K. and Defendant J.K. In the first case, R.K. appeals the November 15, 2004 and February 18, 2005 decisions in which the chancery court required R.K. to resume monthly periodic alimony payments and to pay arrears to J.K. He contends that the court erred (1) in not enforcing the liquidated damages provision, (2) in not enforcing the section allowing him to deduct one-half of his attorney's fees from his monthly alimony payments, and (3) in not granting him relief from those errors under Rule 60(b). J.K. cross appeals the February 2005 decision asserting that the chancery court erred (1) in not finding R.K. in contempt for violating the Agreement and (2) in not awarding her attorney's fees. In the second case, R.K. appeals the February 27, 2006 decision of the Hinds County Chancery Court ordering him to continue child support payments and pay arrears. He argues that the court erred in requiring him to continue child support payments when his minor daughter attends an out-of-state boarding school. We affirm the Chancellor on all issues, except the denial of relief under Rule 60(b), which we reverse. Accordingly, this Court affirms in part and reverses and remands in part.

FACTS
Case 1: Property Settlement
¶ 2. R.K. and J.K. married in 1976. They had two children, L.K. and B.K., and the family resided in Hinds County, Mississippi until 2001 when the couple separated and R.K. subsequently filed for a divorce. J.K. planted a recording device in R.K.'s car, which recorded R.K. talking during various conversations with other health professionals concerning patients and with lawyers regarding his personal legal matters as well as the matters of others in which he served as a medical expert. Upon learning of these recordings, R.K. filed a Motion for Injunctive and Other Relief and subsequently a Motion to Quash, both in May 2002, to prevent J.K. from ever using or divulging the information on the tapes. Later that May the trial court granted in part R.K.'s motion for injunctive relief instituting a preliminary injunction enjoining J.K. from admitting as evidence any of the recorded communications protected by the doctor-patient privilege. While the court did not quash the recorded communications, the court enjoined J.K. from using any of the recordings until the court determined whether the communications should be quashed pursuant to 18 U.S.C. § 2511(1)(b)(i). R.K. filed a motion to reconsider, which the court denied. Thus, the parties agreed on their own terms as to the regulation of the information on the tapes in the divorce settlement agreement.
*769 ¶ 3. The court issued a final judgment of divorce on August 29, 2002 on the grounds of irreconcilable differences, which included the parties' agreement for property settlement and child support. In section 3 of the Agreement, titled "Child Support," R.K. agreed to provide $5,000 monthly in child support for B.K. "as long as [B.K.] lives at home with [J.K.] or until [B.K.] reaches 21 years of age, whichever is first."
¶ 4. Additionally, section 11, titled "Installment Payments," provided in the first paragraph that R.K. would pay J.K. periodic alimony for four months, commencing as monthly payments of $5,000 on September 1, 2002, and thereafter, a lump sum property distribution in monthly payments of $5,000, commencing on January 1, 2003, for 56 months totaling $280,000. The second paragraph of section 11 allowed R.K. to "deduct one half of his cost of defending, settling, or discharging claims arising from his actions which took place prior to the date of the divorce." One of the three types of claims to which this deduction privilege applied was for "any litigation that may arise as a result of J.K.'s instigation, encouragement, or in which J.K. provides assistance, directly or indirectly."
¶ 5. Further, section 19 of the agreement, titled "Additional Covenants," required, inter alia, that J.K.:
(2) will return to [R.K.] all tapes, photos, and any other evidence or material she has in her possession concerning [R.K.]'s or any of his associates' conduct, and all copies, transcripts thereof or other reproductions thereof, (3) will keep confidential and not divulge to anyone any of the content or evidence derived from the use of the materials listed in clause (2), and promptly advise him of any accidental disclosure, (4) agrees not to pursue any litigation, civil or criminal relative to his relationship with other women, and in general will refrain from making any comments to anyone concerning [R.K.'s] alleged marital misconduct, except in counseling which is confidential.
Later in the same paragraph, J.K. and R.K. additionally agreed to the following:
J.K. warrants that she will not divulge the contents of the tapes to anyone . . . If Defendant breaches this Agreement in regards to the tapes, she will pay in liquidated damages the greater of (1) all amounts remaining due hereunder, or (2) One Hundred Thousand Dollars ($100,000).
¶ 6. On December 17, 2002, C.G., longtime friend and legal counsel to R.K., filed suit against J.K. for wiretapping fraud alleging that her recordings included his conversations with R.K. On December 12, 2003, J.K. filed a Petition to Re-Open and Modify Divorce Settlement and Court Order for a Limited Purpose in chancery court requesting that the court modify the Agreement in such a manner as to allow her to defend herself. R.K. filed a Motion to Dismiss, Answer to Petition and Counter-claim for Contempt and Specific Performance on March 12, 2004. The counterclaim requested that the court find J.K. in contempt, inter alia, for violating section 19 by disclosing the contents of the tapes and consequently, that the court order specific performance of the liquidated damages provision in section 11, which would require J.K. to forfeit the remaining $215,000 due of the property distribution lump sum. R.K. offered no evidence of his actual damages. The chancery court denied J.K.'s motion on March 31, 2004, finding that the tapes were certainly discoverable but leaving the determination as to whether J.K. could disclose the contents to the federal district court who was in the best position to decide what information was necessary for disclosure in the wiretapping *770 suit. The court did not address R.K.'s counterclaim for breach of contract at that time.
¶ 7. J.K. counterclaimed in federal court against C.G. on April 2, 2004, for conspiracy, abuse of process, and conversion, and R.K. intervened in the suit on April 12, 2004, consequently making him subject to J.K.'s counterclaim as well. On July 7, 2004, J.K. filed in the federal district court a Motion for Partial Summary Judgment as to the admissibility of certain tapes, treated by the court as a Motion in Limine. J.K. asked the court to rule that the Agreement could not be used to prevent her from defending herself in the wiretapping suit. On September 14, 2004, the federal district court granted J.K.'s motion. J.K. was the only person the court was certain knew the content of the tapes, and thus her testimony was crucial in defense to the wiretapping suit. Since the wiretapping suit was based upon the content of the tapes, it was necessary for J.K.'s defense that she be able to discuss the information on the tapes. Thus, the court granted J.K.'s motion, holding that, solely within the context of that trial, J.K. could discuss the tapes in order to defend herself in the wiretapping suit. The court would address matters concerning evidentiary privileges as the need arose. The court did not decide whether J.K.'s arguments could be construed as "uses" or "disclosures" in violation of the Agreement and left that issue to be decided by the chancery court. On February 17, 2005, the jury found that J.K. proved two of her claims, conversion and abuse of process.[1] The jury also found that she suffered actual damages as a result of R.K.'s actions and consequently awarded her $242,000.
¶ 8. R.K.'s attorney wrote J.K. a letter in May 2004 stating that he advised R.K. to discontinue monthly property distribution payments in order to recoup his legal fees pursuant to Section 11 of the Agreement. On May 21, 2004 J.K. filed a Motion for Contempt and for Specific Performance of Property Settlement Agreement requesting that R.K. be found in contempt for ceasing monthly property distribution payments and that he be required to provide specific performance of his duty per the Agreement to pay arrears and continue payments.
¶ 9. On November 15, 2004, the chancery court responded to J.K.'s motion for contempt and specific performance and R.K.'s counterclaim for breach of contract. The court found R.K. in contempt for willfully and intentionally violating the Agreement by failing to make the $5,000 monthly payments. The court did not enforce the liquidated damages provision in section 19. She enforced the provision as a termination clause, finding "[J.K.] did not commit a material breach" as any disclosure was for a limited purpose among parties who were already aware of the content, and because of the necessity of participating in her own defense, her breach was not willful and thus not contemptuous. The court was thus unconvinced by R.K.'s argument that he withheld the payments because J.K. violated sections 11 and 19 of the Agreement by divulging the contents of certain tapes and making comments concerning R.K.'s alleged marital misconduct. The court found no actual damages shown by R.K. as a result of the disclosure and found the One Million dollar amount excessive. R.K. was ordered to pay $35,000 in arrears and to continue the $5,000 monthly payments as provided by the Agreement. Additionally, because R.K. was found to be in contempt, the court granted J.K. attorney's fees as she *771 requested.[2]
¶ 10. On November 22, 2004, R.K. filed a Motion for Clarification And/Or Reconsideration of November 15, 2004 Opinion claiming that J.K. should be found in contempt, the liquidated damages provision in the Agreement enforced, and R.K. awarded attorney's fees pursuant to the Agreement. He contended that the penalty upon breach of the Agreement applied to each breach, eleven total cited, totaling his claimed damages at 1.1 million dollars. R.K. contended that because it was his contract right to deduct one-half of his attorney's fees from the balance of any sum due J.K., he should not be found in contempt. In response to R.K.'s motion the court, on February 18, 2005, reversed its finding that R.K. was in contempt for deviating from the Order by discontinuing his $5,000 monthly payments to J.K. citing to the inequitable result of imposing a finding of contempt and award of attorney's fees against him and not her. The Court also reversed the order for R.K. to pay J.K.'s attorney's fees.
¶ 11. On March 25, 2005, R.K. filed a Motion For Rule 60(b) Relief From November 15, 2004 Order And/Or Stay of Execution Of Order Pending Appeal requesting, inter alia, that the court alter its November 15, 2004 order to award him liquidated damages pursuant to Section 19 and allow him to recoup half of his attorney's fees pursuant to Section 11. In the alternative, he requested that the court stay the execution of the November 2004 and February 2005 orders awaiting the resolution of the action in federal district court or pending the appeal of the matter to this Court. On June 10, 2005, the chancery court issued a Final Order and Opinion of the Court in response to J.K.'s Motion for Citation For Contempt and on R.K.'s Motion For Rule 60(b) Relief From November 15, 2004 Order And/Or Stay of Execution Of Order Pending Appeal. After having heard testimony and considered the motions, the court stated that R.K. provided inadequate grounds to warrant alteration or amendment to the opinion and reiterated its findings in the February 18, 2005, Order that R.K. was not in contempt for discontinuing payments to J.K. but must pay arrears and continue payments.
¶ 12. R.K. appealed the court's November 2004 and February 2005 orders on June 28, 2005 and J.K. filed a cross appeal in response to the same orders on July 12, 2005.
¶ 13. In the first case, R.K. presents the following five issues on appeal:
I. The trial court erred in failing to enforce the liquidated damages clause in the settlement agreement.
II. The trial court erred in applying the legal standard applicable to terminating a contract for material breach rather than the legal standard applicable to enforcing a liquidated damages clause.
III. The trial court erred in that its findings were not supported by competent evidence
IV. The trial court erred in denying R.K.'s claim to deduct one-half of his legal fees in defending J.K.'s petition to modify the settlement agreement to allow her to discuss the content of his conversations she recorded

*772 V. The trial court erred in denying R.K.'s motion under M.R.C.P. 60(b) to stay execution of the judgment and other relief.
¶ 14. On cross appeal, J.K. presents the following two issues:
I. The trial court erred in failing to hold R.K. in contempt for unilaterally ceasing payments under the agreement
II. The trial court erred by failing to award her attorney's fees
Case 2: Child Support
¶ 15. As aforementioned, in section 3 of the Agreement, titled "Child Support," R.K. agreed to provide $5,000 in child support for B.K. "as long as [B.K.] lives at home with [J.K.] or until [B.K.] reaches 21 years of age, whichever is first." In September 2005, soon after the Parties' daughter B.K. began to attend boarding school in New Jersey, R.K. stopped the $5,000 monthly child support payments required by the Agreement. On October 4, 2005, R.K. filed an Emergency Petition for Declaratory Relief requesting termination of his child support obligation. On February 27, 2006, the chancery court denied R.K.'s motion and required R.K. to pay arrears with interest and to continue child support payments. On March 9, 2006, R.K. appealed that decision.
¶ 16. In the second case, R.K. presents three issues on appeal:
I. The trial court erred in holding that the state of mind of a person was an essential element in determining where that person lived.
II. The trial court erred in holding that when the parties' child was physically in New Jersey during the school year that she was still "living at home with [J.K.]."
III. The trial court erred in holding that R.K. still owed the full child support payment for the months the child was physically present in the boarding school in New Jersey.

DISCUSSION
Standard of Review
¶ 17. Our scope of review in domestic relations matters is limited by the familiar substantial evidence/manifest error rule. Mizell v. Mizell, 708 So.2d 55, 59 (Miss.1998). This Court will not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied. Id. Particularly in the areas of divorce and child support, this Court must respect a chancellor's findings of fact which are supported by credible evidence and not manifestly wrong. Id.
Property Settlement
Liquidated Damages Provision
¶ 18. In his first issue, R.K. argues that he should not have been required to pay arrears and to continue periodic alimony payments because the chancery court should have enforced the liquidated damages provision in the Agreement. We also address his second and third issues regarding the application of an erroneous legal standard and insufficiency of evidence, respectively, since our resolution of his first issue depends on our finding regarding the second and third issues.
¶ 19. R.K. claims the trial court applied an erroneous legal standard because the liquidated damages provision, as it is so named in the Agreement, should be enforced as such. J.K. contends the "liquidated damages" provision is a penalty. Since the chancery court based its decision on neither of these, instead looking to the *773 equity of the situation, this Court will review solely whether the chancery court erred in its employment of equity.
¶ 20. Previously, when considering the enforcement of a liquidated damages provision, this Court has stated that it views property settlement agreements as quasi-contracts. Varner v. Varner, 666 So.2d 493, 496 (Miss.1995). "[W]here a property settlement agreement is entered into in contemplation of a divorce on the grounds of irreconcilable differences, there is more at work than general contract law." Id. (citing Grier v. Grier, 616 So.2d 337, 340 (Miss.1993)). Notwithstanding the Court's view that property settlement agreements are contractual in nature and should be treated as such, "courts of equity have certain discretionary power in the matter of decreeing the specific performance of contracts and they may and should make equitable modifications in the form of relief granted where to do otherwise would result in undue hardship or injustice." Dalton v. Dalton, 874 So.2d 967, 971 (Miss.2004)
¶ 21. Pursuant to the Agreement both parties requested specific performance, J.K. requesting payments to continue and R.K. requesting that they terminate and he be awarded liquidated damages. In deciding whether and how to order specific performance, the chancery court found it necessary to make equitable modifications to the Agreement in order to prevent undue hardship or injustice against J.K. Both courts agreed that the attempt to enforce the Agreement in such a manner as to halt J.K.'s defense has "prevented J.K. from fully defending herself in this action, and it has prevented [the federal district] Court and the parties from being fully informed of all relevant facts." The chancery court found that "without some limited disclosure, [J.K.] would be prevented from fully defending herself in [the wiretapping] action." The court found this position one of "extreme hardship" on J.K. and thus that the circumstances forced her to "breach the agreement in some degree to defend herself." The court found that J.K. did not breach as a result of negligence or willfulness. Diligently attempting to protect the confidentiality of the tapes, J.K. sought a modification of the Agreement for the limited purpose of her defense and disclosed information only in the context of trial among parties who previously had access to, or knew the contents of, the information.
¶ 22. While the chancery court found that J.K. attempted with all good faith to uphold the agreement, it found the converse regarding R.K. Both the chancery and federal district courts found that R.K. assisted in creating a situation which presented J.K. with a Hobson's choice.[3] She could act in such a manner possibly perceived as a breach of the Agreement, or she could sit idly by, defenseless, while R.K.'s close, long time friend, ultimately joined by R.K., charged her with violation *774 of a federal statute. According to the chancery court, R.K., on the other hand, not only participated in a suit that prevented J.K. from carrying out her part of the agreement, but also self-modified his obligation to abide by the very provision he wanted the chancery court to enforce when he and his attorney decided to discontinue making monthly property distribution payments to J.K. as the provision requires. In light of R.K.'s participation in the federal action against J.K. and R.K.'s own violation of the section he seeks to enforce, the chancery court properly considered equity in examining the dispute.
¶ 23. Next, R.K. refutes the competence of the evidence supporting the Court's refusal to enforce the liquidated damages provision. "Equity will enforce a contract for liquidated damages if such liquidated damages can be found to be reasonable and proper in the light of the circumstances of the case." Maxey v. Glindmeyer, 379 So.2d 297, 301 (Miss. 1980).
¶ 24. "[T]he principles of equity and righteous dealing [are] the purpose of the very jurisdiction of the [chancery] court to sustain." Shelton v. Shelton, 477 So.2d 1357, 1358-59 (Miss.1985). It is one of the oldest and most well known maxims that one seeking relief in equity must come with clean hands or face refusal by the court to aid in securing any right or granting any remedy. Id.; See also Cole v. Hood, 371 So.2d 861, 863-64 (Miss.1979) (those who seek equitable relief must do so with clean hands); Thigpen v. Kennedy, 238 So.2d 744, 746 (Miss.1970) (same); Taliaferro v. Ferguson, 205 Miss. 129, 143, 38 So.2d 471, 473 (1949) (same). In other words, whenever a party seeks to employ the judicial machinery in order to obtain some remedy and that party has violated good faith or some other equitable principle, "the doors of the court will be shut against him" and "the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy." Shelton, 477 So.2d at 1359.
¶ 25. The chancery court stated that R.K. and C.G.
allege that [J.K.] has violated their rights and then in the next breath, argue that the Agreement prevents [J.K.] from uttering a word regarding contents of the tape. (quoting the federal district court opinion on the admissibility of the tapes). The Chancery Court is a court of equity and the doctrine of clean hands is a legitimate concern. This Court cannot find that [R.K.] comes into court as "the helpless victim in this ordeal, as he portrays."
Having the discretion to refuse R.K. a remedy due to his "unclean hands", the chancery court decided the equitable remedy would be to award him actual damages for any disclosure. The court noted that the disclosures were in court or related to the suit and could be sealed, placing R.K. in almost the identical position he would have been in had the contract been performed in its entirety. Additionally, it is undisputed that R.K. failed to present evidence of any actual damages. Having found none through examination of the facts presented, the chancery court awarded R.K. nothing and ordered him to pay arrears and to continue the monthly property distribution payments to J.K. Considering the evidence drawn upon by the chancellor, this Court finds that the chancery court did not abuse its discretion.
¶ 26. The chancery court applied the correct legal standard of equity and found sufficient evidence to warrant a refusal to award R.K. the "liquidated damages" provided for in section 19. Therefore, the court acted within its discretion, and R.K.'s first three issues are without merit.
*775 Attorney's Fees
¶ 27. Fourth, R.K. asserts that the chancery court erred in refusing to allow him, pursuant to the Agreement, to deduct one-half of his legal fees spent in defending J.K.'s petition to modify the settlement agreement.
¶ 28. Section 11 of the Agreement provides in the first paragraph for R.K. to pay J.K. a lump sum property distribution and periodic alimony, both by monthly payments. The second paragraph says "[R.K.] may deduct one half of his cost of defending, settling, or discharging claims arising from his actions which took place prior to the date of the divorce." The section includes three types of claims. In dispute is the second type of claim consisting of "any litigation that may arise as a result of [J.K.'s] instigation, encouragement, or in which [J.K.] provides assistance."
¶ 29. The language of the contract is unambiguous. R.K. and J.K. agreed that R.K. would pay J.K. a set amount as alimony and property distribution and that R.K. could deduct from these monthly payments one-half of the cost of defending particular claims. The parties dispute the applicability of that language in this case, particularly, (1) whether R.K. is defending a claim or is the originator of the claim and (2) whether the claim arises out of actions by R.K. prior to the divorce. If the answer is negative to either of these, R.K. cannot deduct attorney's fees from his monthly payments.
¶ 30. The federal district court remarked as to who sued whom in the following manner:
The Agreement became an issue in this federal action when [C.G.] initially sued [J.K.] for wiretapping fraud. It is an issue because the only action [C.G.] has against [J.K.] is for an actual interception, and for [C.G.] to prove an actual interception this Court and the jury must know what is or is not on the tape.
Regarding R.K.'s role in both the state and federal suits, the district court said:
[R.K.] argues he "has been placed in a very difficult position as a direct result of defending claims made against him by [J.K.] in both state and federal courts" . . . Perhaps this statement would carry some weight had [J.K.] sued [R.K.]. But she did not. [R.K.] argues he was "forced" to join this case and file an action because [J.K.] "sued" him . . . Because of [J.K.'s] petition for modification [R.K.] claims he was "sued" and had to join this action. That is a very generous definition of being sued . . . It would be one thing if [R.K.] simply sought to enjoin [J.K.] in this action, but he did not. He sought to enjoin her and sue for damages. All of this makes it somewhat hard to believe he is the helpless victim in the ordeal as he portrays.
This Court agrees with the essence of the federal district court's remarks. The underlying claim here is not one in which R.K. finds himself a victim defending against a suit instigated by J.K. The underlying claim at the heart of all these disputes regarding the property settlement agreement is the claim brought by C.G. against J.K., a suit in which R.K. joined as a plaintiff. As for the proposition that R.K.'s attorney's fees were incurred defending a suit brought against him by J.K., R.K.'s first argument fails.
¶ 31. The dispute of whether the claim arises from R.K.'s actions prior to divorce is easily resolvable. There are situations where such language as "arising from" or "arising out of" has been construed by this Court as broad language, reaching far in its effect. MS Credit Ctr. v. Horton, 926 So.2d 167, 176 (Miss.2006). However, to connect a modification dispute to R.K.'s *776 communications prior to the divorce as R.K. suggests would require this Court to endorse a reading that effectively encompasses all claims, as J.K. says, including those having any tenuous relationship to any pre-divorce conduct of R.K. This Court has not and will not extend such language to be all-encompassing, applicable to every claim between the signatories of the agreement. The "arising from" language only extends broadly concerning circumstances that meet the qualifying language following the "arising from".
¶ 32. Accordingly, for section 11 of the Agreement to take effect, J.K.'s petition for modification must have arisen from R.K.'s actions prior to the divorce. The petition for modification arose solely from the actions of C.G. who filed suit against J.K. after the divorce. Apparently, the petition for modification arose from actions other than R.K.'s, which occurred after the divorce, and thus, R.K. is not entitled to deduct attorney's fees pursuant to Section 11 which only applies to claims arising from R.K.'s actions before the divorce.
¶ 33. Clearly, lacking either requisite to prompt the application of Section 11, R.K.'s claim for attorney's fees as provided for by section 11 of the Agreement is without merit, and the chancery court properly refused to allow R.K. to succeed in his self-termination of property distribution payments.
M.R.C.P. Rule 60(b) Motion for Relief
¶ 34. R.K. submits as his fifth issue that the chancery court erred in denying his motion under M.R.C.P. 60(b) to stay execution of the judgment and for other relief. After hearing testimony and considering R.K.'s motion, the chancery court found that R.K. failed to provide adequate reasoning as to why the court should alter or amend its previous Order. The question this court must answer is whether the chancery court abused its discretion in finding R.K.'s arguments inadequate to warrant relief under Rule 60.
¶ 35. This Court reviews denial of a Rule 60 request for relief for abuse of discretion. M.A.S. v. Miss. Dep't of Human Servs., 842 So.2d 527, 530 (Miss. 2003). Relief is afforded pursuant to M.R.C.P. 60(b)(6) under extraordinary and compelling circumstances. Id. The Rule is a grand reservoir of equitable power to do justice in a particular case. Id. However, Rule 60 is not a means for those who had procedural opportunity for remedy under other rules and failed, without cause, to pursue such avenues. Id. The considerations for determination of Rule 60(b) motions are:
(1) that final judgments should not be lightly disturbed; (2) that the Rule 60(b) motion is not to be used as a substitute for appeal; (3) that the rule should be liberally construed in order to achieve substantial justice; (4) whether the motion was made within a reasonable time; (5) [relevant only to default judgments]; (6) whether if the judgment was rendered after a trial on the merits the movant had a fair opportunity to present his claim or defense; (7) whether there are any intervening equities that would make it inequitable to grant relief; and (8) any other factors relevant to the justice of the judgment under attack.
Id.
¶ 36. R.K. submits to this Court as extraordinary circumstances J.K.'s double recovery. Within four months of the chancery court's order, R.K. filed for relief, asserting he should be relieved of paying the same judgment twicethe arrears and remaining payments due per the Agreement as ruled by the chancery court and the federal jury award to J.K., an amount largely based on J.K.'s claim for conversion of the remaining property distribution *777 payments when R.K. ceased payments.[4] J.K. contends that the two claims are different because one is a contract claim, and the other is a tort claim.
¶ 37. It is well known that this state does not endorse double recovery. Judgments involving property settlement agreements are also subject to this policy. Double recovery is a tort doctrine that prevents unjust enrichment by precluding a recovery of the same damages multiple times or beyond 100% of the judgment. (emphasis added). See Medlin v. Hazlehurst Emergency Physicians, 889 So.2d 496, 499 (Miss.2005) (holding that a plaintiff may only recover once for his damages). The theory of double recovery is not defeated simply by bringing claims under two different areas of law as J.K. suggests. Instead, the inquiry in this case in determining whether the theory of double recovery applies is simply whether the claimant is attempting to obtain payment of her monetary loss more than once. Clearly, allowing J.K. to recover the chancery court judgment for property distribution payments as well as the federal court judgment for conversion of those same payments would be contrary to this state's policy against multiple recoveries for the same damages. Construed in order to achieve substantial justice, Rule 60(b) requires relief from one of the judgments as to the portion attributable to the property distribution payments.
¶ 38. At this time the occurrence of J.K.'s double recovery is uncertain. As alternative relief, R.K. requests from this Court a stay of the execution of the judgment in chancery court until the appeal in the Fifth Circuit is resolved. We grant that request. The execution of the chancery court order should have been stayed until the Fifth Circuit issued a decision. If the district court award is affirmed, the chancery court must grant R.K. relief from its judgment in order to prevent double recovery, and conversely, upon reversal the chancery court must deny R.K. relief and require payment. Accordingly, the chancery court erred in its denial of relief to R.K. under Rule 60(b).
Cross Appeal
Contempt
¶ 39. A chancellor has substantial discretion in deciding whether a party is in contempt. Lahmann v. Hallmon, 722 So.2d 614, 620 (Miss.1998). Contempt is an issue of fact to be decided on a case-by-case basis. Mizell, 708 So.2d at 64. Regarding a determination of contempt, a trial court due to its temporal and physical proximity to the parties "is infinitely more competent to decide the matter." Cumberland v. Cumberland, 564 So.2d 839, 845 (Miss.1990).
¶ 40. J.K. submits for application by this Court the burden shifting scheme in Lahmann. In that case this Court held that in a contempt action involving unpaid child support, a prima facie case is *778 achieved when the party entitled to receive child support introduces evidence that the party required to pay the support has failed to do so. Lahmann, 722 So.2d at 620. Then the burden shifts to the party who failed to pay to show an applicable defense, and this proof must be clear and convincing. Id. This method of reviewing contempt decisions has been employed by this Court numerous times. See McIntosh v. Dep't of Human Servs., 886 So.2d 721, 724-25 (Miss.2004); Fancher v. Pell, 831 So.2d 1137, 1143 (Miss.2002). Since R.K. concedes the fact that he stopped making child support payments in September 2005, a prima facie case has been established, leaving the question of whether R.K. has a valid defense for his action. Id.
¶ 41. This Court has held that contempt can only be willful. Mizell, 708 So.2d at 64. "A contempt citation is proper only when the contemnor has willfully and deliberately ignored the order of the court." Id. (citing Cooper v. Keyes, 510 So.2d 518, 519 (Miss.1987)). "It is a defense to a contempt proceeding that the person was not guilty of willful or deliberate violations of a prior judgment or decree." Id. (citing Dunaway v. Busbin, 498 So.2d 1218 (Miss.1986)). J.K. contends that R.K. clearly willfully violated the Agreement, but R.K. asserts his cessation of payments was not a willful violation because he thought his actions were appropriate per advice of his counsel. The question then becomes whether one who ceases support payments to his spouse upon the advice of his attorney has acted willfully.
¶ 42. This Court has previously held in Mizell that a chancellor was within its discretion in not finding in contempt a father who ceased child support payments on the grounds that his attorney advised such action. 708 So.2d at 64. As in this case, the father claimed he did not act willfully in stopping child support payments because he did so upon the advice of a lawyer. Id. After initially holding R.K. in contempt because he ceased making payments as required by the Agreement, upon examination the chancery court decided that R.K. did not act willfully and deliberately since he acted in accordance with his attorney's advice. We find no manifest error in the court's final determination that R.K. was not in contempt.
Attorney's Fees
¶ 43. In a divorce case, generally, an award of attorney's fees is left to the sound discretion of the trial court. Pittman v. Pittman, 652 So.2d 1105, 1111 (Miss.1995) (citing Cheatham v. Cheatham, 537 So.2d 435, 440 (Miss.1988)). This Court is reluctant to disturb that discretionary determination. Id. (citing Ferguson v. Ferguson, 639 So.2d 921, 937 (Miss. 1994)).
¶ 44. J.K. contends that had R.K. been in contempt, she should be awarded attorney's fees, but this Court has upheld an award of attorney's fees both when the trial court reached a finding of contempt, as well as when the trial court did not reach a finding of contempt. Compare Lahmann, 722 So.2d at 623 (holding that success on a motion for contempt made the movant eligible for attorney's fees) with Mizell, 708 So.2d at 65 (holding that contempt is not necessary for the moving party to be awarded attorney's fees). Thus, precedent indicates that an award of attorney's fees is not contingent on a finding of contempt.
¶ 45. J.K. further asserts that the McKee factors supply the appropriate standard for attorney's fees and that a balance of those factors would favor her. McKee v. McKee, 418 So.2d 764, 767 (Miss. 1982). This Court has applied different standards in different cases. In 2002, the *779 last time this Court dealt with this exact issue it promulgated two decisions. The first, Chesney v. Chesney, 849 So.2d 860, 863 (Miss.2002) applied the McKee factors, but the second, Hensarling v. Hensarling, 824 So.2d 583, 592 (Miss.2002) cited the Pittman ability to pay standard, however, finding that regardless of the movant's ability to pay, the movant would be awarded attorney's fees for reimbursement of extra legal costs incurred as a result of the defendant's conduct.
¶ 46. Though this Court has differed previously in its statements as to the mandatory considerations before a trial court awards attorney's fees, each standard was followed by an indication that the ultimate decision is within the discretion of the trial court. See Hensarling (citing Pittman, 652 So.2d at 1112, for the proposition that while the movant's ability to pay is the general rule, a chancellor has great discretion in the matter and may appropriately award attorney's fees without satisfying that general rule). Therefore, absent an apparent abuse of discretion, this Court will assume the chancellor considered the appropriate factors in awarding attorney's fees. See Sarver v. Sarver, 687 So.2d 749, 755 (Miss.1997) (overruled on other grounds). We find no error in the chancellor's final decision to not award attorney's fees to J.K.
Child Support
¶ 47. The last three issues R.K. raises regard his child support obligation while his daughter B.K. attends boarding school in New Jersey. The contentions of R.K. and J.K. regarding his unauthorized cessation of child support payments revolve around the meaning of the phrase "lives at home with [J.K.]." R.K. suggests B.K. does not "live" with J.K. while she is at boarding school, relieving him of his obligation to pay J.K. child support payments, while J.K. argues the converse as to the interpretation and resulting obligation. The issues R.K. submits regarding his child support obligation are all resolved by determining when, if ever, the duty to pay child support to a minor child can be terminated in compliance with a divorce settlement agreement.
¶ 48. The Court has considered a similar question and decided the noncustodial parent is prohibited from contracting to cut off child support before the child reaches the age of twenty-one, unless the child is emancipated. Lawrence v. Lawrence, 574 So.2d 1376, 1381 (Miss. 1991). In Lawrence the Court considered whether a parent can contract to end child support before his or her child reaches majority. Id. "The duty to support children is a continuing duty on both parents and is a vested right of the child. Applying [this principle], it follows that parents cannot contract away rights vested in minor children. Such a contract would be against public policy." Id. (citing Calton v. Calton, 485 So.2d 309, 310 (Miss.1986)). "Further, while a property settlement agreement, judicially approved, is always given great weight by this Court, the agreement and weight given may not extinguish the rights of a minor child and cut off child support prior to the emancipation, all to the detriment and interest of the child." Id. Thus, as in Lawrence, this Court holds that a child support agreement which ends support for a child before that child reaches the age of twenty-one or is otherwise emancipated, is unenforceable. Id.
¶ 49. Therefore, R.K.'s contentions that the trial court erroneously interpreted the phrase "lives at home" in the Agreement are irrelevant to whether he must pay child support. As precedent requires, R.K. must continue paying child support despite B.K.'s attendance at a New Jersey *780 boarding school. This obligation continues regardless of how the trial court interprets what it means to "live at home with [J.K.]." The Court need not resolve the proper interpretation of the phrase but merely to reiterate what it has previously said. The last three issues R.K. raises are resolved by Lawrence. R.K. and J.K. cannot contract to terminate B.K.'s right of support.
¶ 50. With regard to R.K.'s decision to stop child support payments before seeking the court's permission, it is clear that a parent seeking a change in child support payments must file a motion for modification with the proper court and show a material change in the circumstances of one or more of the interested parties. Sumrall v. Munguia, 757 So.2d 279, 282 (Miss.2000). A parent obligated to pay child support cannot reduce child support payments without a court order, and when such event happens the parent who deviated from his obligation must pay accrued child support. Williams v. Rembert, 654 So.2d 26, 29 (Miss.1995). Thus, the trial court properly required R.K. to pay arrears and to continue child support payments.

CONCLUSION
¶ 51. As for the case which concerned the property settlement distribution, the chancery court is affirmed with regard to issues I-IV. However, Issue V, denial of M.R.C.P. Rule 60(b) relief, is reversed and remanded, and after the Fifth Circuit renders its decision, the chancery court is instructed to proceed in accordance with this opinion. On cross appeal, the chancery court is affirmed as to both issues. Lastly, in the child custody case, the judgment of the chancery court is also affirmed as to the three issues raised.
¶ 52. ON DIRECT APPEAL: AFFIRMED IN PART; REVERSED AND REMANDED IN PART. ON CROSS APPEAL: AFFIRMED.
WALLER AND COBB, P.JJ., EASLEY, DICKINSON AND RANDOLPH, JJ., CONCUR. GRAVES, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. DIAZ AND CARLSON, JJ., NOT PARTICIPATING.
NOTES
[1] Her claim of conspiracy was finally dismissed with prejudice.
[2] The chancery court awarded attorney's fees to each party relative to the court's contempt findings. In addition to deeming R.K.'s cease of payments as contemptuous, the court also found J.K. in contempt for failing to inform R.K. of certain medical needs of L.K., their child.
[3] The district court judge stated:

It would be patently unfair to preclude [J.K.] from testifying about the contents of the tapes, or, more to the point, that [C.G.'s] voice is not audible on them. Such an action would allow [C.G.] to maintain an action on the basis that his voice was actually recorded, when he has not even listened to the tapes nor presented any evidence that his voice was actually recorded, and then preclude [J.K.] from discussing the tapes, when she has heard the tapes. [J.K.] should be able to defend herself in this federal action by discussing the tapes, which form the foundation for this entire suit. [J.K.] and [R.K.] are the only persons with direct knowledge as to the contents of the tapes. That evidence is relevant to this case. [C.G.] cannot have this cause of action based on the content of the tapes and prohibit [J.K.'s] testifying as to those contents.
[4] The district court cited as J.K.'s damages:

payments due her per the divorce settlement which [R.K.] stopped paying; mental anguish and emotional distress, for which she obtained medical treatment; missing approximately five days of work because of this federal case, for which she lost wages of approximately $1050; incurring attorney's fees, which had reached approximately $45,000 by the end of April 2004; and, paid $500 to a process server due to [R.K.'s] dodging process.
While this information from the district court opinion indicates J.K.'s claim of damages for conversion indeed consisted of the monies due as property distribution payments, beyond the jury's verdict and award of $242,000, this Court has no information in the record as to the amount awarded for each individual claim for damages.