# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-CA-00783-COA

ANTHONY OWEN PULLEN                             APPELLANT

v.

STEPHANIE LAKE PULLEN                         APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 03/04/2015 |
| TRIAL JUDGE: | HON. MITCHELL M. LUNDY JR. |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | A.E. (RUSTY) HARLOW JR. |
| | KATHI CRESTMAN WILSON |
| ATTORNEYS FOR APPELLEE: | KAY FARESE TURNER |
| | EMILY HAMM HUSETH |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| TRIAL COURT DISPOSITION: | GRANTED IRRECONCILABLE-DIFFERENCES DIVORCE, DIVIDED THE MARITAL ESTATE, AND AWARDED WIFE ALIMONY AND ATTORNEY'S FEES |
| DISPOSITION: | AFFIRMED - 08/02/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., WILSON AND GREENLEE, JJ.**

**LEE, C.J., FOR THE COURT:**

¶1. In this appeal, we must determine whether the chancellor equitably divided the parties' marital assets and properly awarded the wife alimony and attorney's fees.

## PROCEDURAL HISTORY

¶2. Anthony and Stephanie Pullen were married in 1987 and had one daughter, Layne, born in 1993.[1] Stephanie filed for divorce on November 5, 2013, in the DeSoto County

---

[1] Layne turned twenty-one years old while divorce proceedings were pending.

Chancery Court. On October 21, 2014, the chancellor entered a consent order requiring Anthony to pay Stephanie $2,200 per month in temporary alimony. Anthony was to continue paying expenses associated with the marital home. A trial on the matter occurred on January 15, 2015, and on February 13, 2015, the chancellor entered a final judgment of divorce. The chancellor divided the marital assets and ordered Anthony to pay Stephanie $2,500 per month in periodic alimony and $15,000 in attorney's fees.

¶3.    Anthony now appeals, asserting the chancellor erred in (1) dividing the marital assets; (2) awarding alimony to Stephanie; and (3) awarding attorney's fees to Stephanie. Stephanie filed a motion requesting attorney's fees on appeal.

**FACTS**

¶4.    Stephanie and Anthony were married while still in college. After college, they moved to Memphis, Tennessee, where Stephanie worked at a local church's daycare. Stephanie worked at the daycare for approximately ten years, earning eight dollars per hour. In 2000, both parties agreed that Stephanie should cease working in order to care for their daughter and home. Four months after their move, Anthony began working for Travelers Insurance, where he worked for ten years. At the time of trial, Anthony was employed by Sedgwick Claims Management Services as vice president of operations. He had worked there approximately eleven years and received an annual base salary of $136,000 as well as yearly bonuses. His bonus for 2013 was $10,000.

¶5.    Anthony admittedly engaged in an extramarital affair that began in 2007 and, except for a one-year hiatus, lasted until 2013. Anthony also claimed he was addicted to sex and

2

pornography and admittedly viewed pornography on the family iPad. Anthony admitted to patronizing strip clubs several times in 2014.

¶6. In 2008, Anthony was diagnosed with multiple sclerosis. He currently takes medication via injection three times per week. According to Anthony, the diagnosis has not affected his ability to work. Since his diagnosis, Anthony has received several promotions at work. After Stephanie filed for divorce in October 2013, Anthony left the marital home, located in DeSoto County, and first lived with his brother for several months before moving into an apartment in Memphis.

¶7. In August 2014, Stephanie accepted a job as a preschool teacher in Starkville, Mississippi, earning eight dollars per hour. Layne was a student at Mississippi State University, and the two shared an apartment.

¶8. Anthony was awarded the following marital assets: twenty-five percent of the equity in the marital home;[2] his 2015 bonus; a 2006 Chevrolet Corvette valued at approximately $29,000; a 2002 Ford F150 valued at $6,250; a four-wheeler valued at $3,000; a checking account with approximately $1,600; forty percent of another checking account with a balance of approximately $500; forty percent of the value of his Sedgwick pension;[3] forty percent of the value of his 401(k) account valued at approximately $72,000; forty percent of any 2014 tax refund; and numerous other items such as guns, a boat, and sporting goods. There was

---

[2] The fair market value of the home was $219,000, and the mortgage balance was $181,698.79 as of December 28, 2014. The chancellor ordered the parties to sell the house and gave Anthony permission to live there until it sold.

[3] This pension plan was frozen in 2006. According to a document in the record, the monthly payment will be between $110 and $196, depending upon when Anthony retires.

no debt associated with the Ford F150 and the four-wheeler. And the chancellor noted that the last loan payment on the Corvette was due in February 2015.

¶9. Stephanie was awarded the following: seventy-five percent equity in the marital home; a 2008 Nissan Altima valued at $8,825; a checking account with a balance of approximately $4,165; another checking account with a balance of $78; sixty percent of the checking account with the $500 balance; sixty percent of Anthony's pension; sixty percent of Anthony's 401(k); and sixty percent of any 2014 tax refund. There was no debt associated with the Altima.

¶10. The chancellor ordered each party to be responsible for any debts associated with marital assets awarded to them. Anthony was ordered to be responsible for the debt on four credit cards—one had a balance of $60; two had a zero balance; and one had a balance of approximately $2,500.[4] Anthony was to continue paying for Layne's car, which had a loan balance of $10,160.30 as of December 28, 2014. And Stephanie was ordered to be responsible for the debt owed to her uncle, Robert Balducci.[5] Balducci had loaned Stephanie approximately $40,000 for attorney's fees during the divorce.

## STANDARD OF REVIEW

¶11. We afford chancellors much discretion in our review of domestic-relations cases. *Steiner v. Steiner*, 788 So. 2d 771, 777 (¶18) (Miss. 2001). This Court will not disturb a chancellor's findings unless they are manifestly wrong or clearly erroneous, or the chancellor

---

[4] This last credit card was associated with Sedgwick and used for work purposes.

[5] The chancellor did not consider this loan to be a marital debt.

4

applied an erroneous legal standard. *Mizell v. Mizell*, 708 So. 2d 55, 59 (¶13) (Miss. 1998).

## DISCUSSION

### I.      Equitable Division

¶12.    Anthony first argues that the chancellor erred in equitably dividing the marital assets. The chancellor conducted a thorough *Ferguson*[6] analysis, and Anthony only challenges some aspects of the chancellor's findings.   Specifically, Anthony contends that: the line of demarcation should have been the temporary hearing; he did not wastefully dissipate assets; his illness will affect his future earning capacity; and he should not have been assigned any marital debt.

¶13.    Anthony cites to *Pittman v. Pittman*, 791 So. 2d 857 (Miss. Ct. App. 2001), to support his argument that the line of demarcation between marital and separate property should have been the date of the temporary support order rather than the date of the divorce hearing. However, *Pittman* was overruled by *Collins v. Collins*, 112 So. 3d 428 (Miss. 2013).   In *Collins*, the Mississippi Supreme Court stated that determining the line of demarcation is within the chancellor's discretion and that it can be "either the date of separation (at the earliest) or the date of divorce (at the latest)." *Id*. at 431-32 (¶¶9, 11) (quoting *Lowrey v. Lowrey*, 25 So. 3d 274, 285 (¶27) (Miss. 2009)).   In this instance, the chancellor appropriately determined the line of demarcation was the date of the divorce hearing, January 15, 2015. The divorce hearing was only three months after the temporary support order, and there was no evidence of any new assets acquired during this time period.

---

[6] *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994).

¶14. In regard to wasteful dissipation of assets, the chancellor found that Anthony did dissipate assets "by a lavish and rather irresponsible lifestyle, frequenting restaurants with girlfriends and going to 'strip' clubs, as well as buying gifts for female acquaintances," but noted that the dissipation was not "extreme." Anthony contends that any dissipation of assets occurred after the temporary order; thus, the property used was not marital. However, Anthony admitted that much of this behavior occurred prior to the entry of the temporary order. We can find no error by the chancellor in this instance.

¶15. Anthony next contends that the chancellor disregarded the effect his multiple sclerosis would have on his earning capacity. The chancellor found that Anthony's diagnosis had not affected his ability to work, a fact that Anthony testified to during the hearing. Anthony testified that he had never missed a day of work and that his income-producing ability had not been impacted thus far. Anthony also admitted that his illness had not interfered with his sexual relationship with another woman during the marriage. Most importantly, Anthony offered no proof regarding his medical diagnosis or how it would affect his future earning capacity. We find no merit to this issue.

¶16. Anthony argues that he should not have been assigned all of the marital debt, considering he is obligated to pay the mortgage until the marital home is sold. It is well settled that equitable distribution does not mean equal distribution. *Dunn v. Dunn*, 911 So. 2d 591, 596 (¶12) (Miss. Ct. App. 2005). Apart from the mortgage balance on the marital home and the balance on Layne's car, the parties had minimal marital debt. The chancellor determined that Anthony had a greater earning capacity than Stephanie, noting that Anthony

6

"will be able to . . . accumulate assets and have financial security, where[as], [Stephanie] may not." As previously stated, the chancellor made comprehensive findings pursuant to *Ferguson* in dividing the marital estate. And we find substantial evidence to support these findings. This issue is without merit.

## II. Alimony

¶17. Anthony next argues that the chancellor erred in awarding Stephanie periodic alimony. "A wife is generally entitled to periodic alimony when her income is inadequate to allow her to maintain her standard of living and when her husband is able to pay." *Kilpatrick v. Kilpatrick*, 732 So. 2d 876, 882 (¶21) (Miss. 1999). If there is substantial evidence in the record to support a chancellor's finding of fact, no matter what contrary evidence there may be, an appellate court will uphold the chancellor. *Bower v. Bower*, 758 So. 2d 405, 412 (¶31) (Miss. 2000).

¶18. The chancellor first determined that "the value of the marital assets is not such that could enable this court to equitably divide the same to eliminate period[ic] payments to" Stephanie. The chancellor then discussed in detail the *Armstrong* factors, which are: (1) the income and expenses of the parties; (2) the health and earning capacities of the parties; (3) the needs of each party; (4) the obligations and assets of each party; (5) the length of the marriage; (6) the presence or absence of minor children in the home; (7) the age of the parties; (8) the standard of living of the parties; (9) the tax consequences of the support decree; (10) fault or misconduct; (11) wasteful dissipation of assets by either party; and (12) any other factor deemed to be fair and equitable. *Armstrong v. Armstrong*, 618 So. 2d 1278,

7

1280 (Miss. 1993).

¶19. On appeal, Anthony finds fault with the chancellor's findings regarding factors one, two, four, and eleven. In regard to the income and expenses of the parties, Anthony contends that after taxes, insurance, alimony, the car payment, and the mortgage payment, he has only $2,992.06 to pay his reasonable living expenses. But Stephanie will have $3,467.30—$967.30 net income plus $2,500 alimony—to pay her reasonable living expenses. However, Anthony's calculations in regard to Stephanie's expenses do not include deductions for her rent. Regardless, the chancellor did note that Anthony's debts were greater due to his payment of the mortgage and the note on Layne's car. Ultimately, the chancellor found Anthony's income was substantially more than Stephanie's income. We find substantial evidence to support this finding.

¶20. In regard to the health and earning capacities of each party, the chancellor noted Anthony had multiple sclerosis that "is permanent, but currently under control." Anthony himself testified that his condition had not affected his ability to work thus far. The chancellor found Anthony's earning capacity was greater than Stephanie's earning capacity since Anthony had worked throughout the parties' marriage, while Stephanie left the work force for fourteen years to raise Layne and maintain the marital home. There was testimony that Stephanie could increase her earning capacity by becoming a certified teacher, which would pay her two dollars more per hour than her current salary. There was substantial evidence to support the chancellor's findings.

¶21. Anthony next contends that the chancellor erroneously found the factor regarding

8

obligations and assets of the parties to be neutral, when Stephanie was awarded the majority of the assets and none of the debts. However, the chancellor simply found that "the obligations of both parties are relatively minor, and [they] should be commended for keeping costs down; however, assets are relatively small with such a long marriage."

¶22. Lastly, Anthony again claims the chancellor erred in finding he dissipated marital assets. Anthony simply raises his prior argument that the line of demarcation should have been the temporary support order, not the date of the divorce hearing. As previously discussed, we found no abuse of discretion by the chancellor in using the date of the divorce hearing as the line of demarcation.

¶23. We find substantial evidence to support the award of periodic alimony. This issue is without merit.

### III.    Attorney's Fees

¶24. In his final issue on appeal, Anthony contends the chancellor erred in awarding $15,000 in attorney's fees to Stephanie. "The award of attorney['s] fees in divorce cases is left to the discretion of the chancellor, assuming he follows the appropriate standards." *Creekmore v. Creekmore*, 651 So. 2d 513, 520 (Miss. 1995) (citing *Adams v. Adams*, 591 So. 2d 431, 435 (Miss. 1991)). "Attorney['s] fees are not generally awarded unless the party requesting such fees has established the inability to pay." *Id*. (citing *Dunn v. Dunn*, 609 So. 2d 1277, 1287 (Miss. 1992)).

¶25. It has long been the practice of trial courts to apply the factors in *McKee v. McKee*, 418 So. 2d 764, 767 (Miss. 1982), in awarding attorney's fees. Those factors are: (1) a

party's financial inability to pay, (2) the skill and standing of the attorney, (3) the nature, novelty, and difficulty of the case, and (4) usual and customary fees for similar cases. *Id*. In this case, the chancellor did not make an on-the-record analysis of the *McKee* factors, but there was evidence in the record of Stephanie's inability to pay her attorney's fees as well as the reasonableness of her attorney's fees. There was also testimony regarding additional fees incurred by Stephanie caused by Anthony's refusal to cooperate in scheduling his deposition as well as other discovery matters. We find no merit to this issue.

### IV. Attorney's Fees on Appeal

¶26. Stephanie requests that this Court order Anthony to pay $7,500 for her attorney's fees and expenses on this appeal. When allowed, this Court has generally granted attorney's fees in the amount of one-half of what was awarded in the chancery court. *Lauro v. Lauro*, 924 So. 2d 584, 592 (¶33) (Miss. Ct. App. 2006) (citing *Monroe v. Monroe*, 745 So. 2d 249, 253 (¶17) (Miss. 1999)). The award of attorney's fees is based on necessity rather than entitlement. *Id*. Therefore, this Court awards $7,500 to Stephanie for her attorney's fees associated with the costs of this appeal.

¶27. **THE JUDGMENT OF THE DESOTO COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, FAIR, JAMES, WILSON AND GREENLEE, JJ., CONCUR.**